391 S.E.2d 90

**STATE of West Virginia**

**v.**

**Ronald Eugene DANIEL.**

**No. 19301.**

Supreme Court of Appeals of West Virginia.

March 9, 1990.

---

Lee H. Adler, Beckley, for Ronald Eugene Daniel.

Kristen Keller, Chief Deputy Prosecutor, Office of the Prosecutor, Beckley, for State of W. Va.

BROTHERTON, Justice:

This case is before the Court on Ronald Eugene Daniel's appeal from the final order of the Circuit Court of Raleigh County, dated January 18, 1989, which imposed consecutive sentences of not less than ten years to life for a first degree murder conviction and not less than three nor more than ten years for a malicious wounding conviction.

On July 8, 1988, the appellant accompanied several friends to the Legends nightclub in Daniels, West Virginia. Also present at the Legends club were Jimmy Torrence and Cecil Miller, who arrived in a van operated by Torrence. The passengers of this van, Jimmy Torrence, his sixteen-year-old brother, Timmy, Bobby Goodson, Aaron Bolen, Cecil Miller, and Walter Dale Morgan (who was killed later that evening), apparently had been drinking and smoking marijuana.

Daniel and Torrence were acquainted and met that night, apparently by chance, in the night club, where they had several drinks. When the appellant's companions decided to leave, the appellant told them that he would stay and find a ride home.

When the club closed, Daniel exited with Jimmy Torrence. At that time, they became involved in a fist fight with two men known as the "Patton brothers," who allegedly had a grudge against Jimmy Torrence. Trial testimony revealed that Daniel was injured in the fight after being hit about the head. He claimed that he was left dazed by the beating.

After the fight was over, Jimmy Torrence offered Daniel a ride home. Two new passengers, Bobby Lane and an unknown woman, also entered the van at Torrence's invitation for a ride home. At this point, the facts become hazy. Daniel testified at trial that he did not remember getting in the van or speaking to anyone in the van, but "woke" in the front passenger seat frightened to discover there were several people in the van that he did not know. He stated he didn't know if they were the men who beat him up, and that he also didn't trust Torrence. Thus, he put a gun to Torrence's head and told him to drive to

the police. Claiming several people were coming towards him in a threatening manner, he aimed his gun, allegedly at the floor of the vehicle, and fired three shots to scare them away. Two of the three shots hit Walter Morgan in the chest. Morgan later died as a result of the wounds received. The third bullet hit Cecil Miller in the arm, which was not a serious injury. The van apparently stopped, and the remaining passengers, including Morgan but excluding Miller, quickly slipped out after the shots were fired.[1] Sometime after the van left the scene, an ambulance was called for Morgan, who died shortly thereafter. Miller remained passed out in the back of the van.

Daniel again put the gun to Torrence's head and told him to drive him to a State Police station. However, he directed Torrence to drive the opposite direction from the police station. Torrence eventually stopped the van upon seeing a police cruiser sitting at the side of the road, and Daniel exited the van with the gun still to Torrence's head. However, Daniel handed the gun to the police officer without a struggle.

The officer, on searching the van, found marijuana cigarettes in the van and a bag of LSD outside the front bumper of the van, a spot Daniel had passed when he exited the van. Oddly, no drug screen was done on Daniel, although one was performed on Torrence, which was positive for alcohol and marijuana.

In an affidavit prepared shortly after the shooting, Torrence reported that after he and Daniel were done fighting, they had jumped in the van and were headed home when Daniel put a gun to his head and told him to take him to the State Police Headquarters. Shortly thereafter, shots were fired. Torrence stated that he did not believe anyone in the van had been arguing nor did he believe Daniel knew the other men in the van. Torrence recalled that at the bar some man had been talking to Daniel. Daniel told him that he wasn't

worried about the other man and pulled his gun out of his trouser waistband enough that Torrence could see it.

At trial, Bobby Lane testified that while there were no angry words between Daniel and Morgan, Daniel appeared perturbed at Morgan, apparently an old acquaintance, for not helping him in the fight. He stated Daniel talked about going back to get the men who beat him up. Further, several occupants of the van testified at trial that they did not move forward in the van until *after* the gun was fired, when they all exited the van, with the exception of Cecil Miller, who was passed out in the back.

Following a trial held in the Circuit Court of Raleigh County, the appellant was convicted of first-degree murder and malicious wounding. By final order dated January 18, 1989, he received consecutive sentences of ten years to life on the murder conviction and three to ten years on the malicious wounding conviction.

The appellant presents several issues to this Court for review. The first assignment of error relates to a jury tampering charge the appellant claims supports his request for a mistrial. Secondly, the appellant argues it was reversible error to allow *Ferguson* inferences to be used in light of the constitutional amendment giving a citizen the right to bear arms. The appellant next alleges ineffective assistance of counsel because of trial counsel's use of a specific witness. Also alleged is a charge that Jury Instructions 4 and 5 unconstitutionally shifted the burden of proof. Finally, the appellant contends the evidence was insufficient to support the verdict and that the court erred in its interpretation of the concept of transferred intent. We find no merit in the appellant's remaining assignments of error and accordingly, do not address them.

### I.

The first issue we address is the appellant's contention that the trial court erred in not calling a mistrial based upon evi-

---

1. Bobby Lane and the woman had been dropped off at Raleigh Motor Sales before the shooting occurred.

dence of jury tampering. The jury tampering incident occurred when a witness for the appellant, Betty Kelly, telephoned one of the twelve jurors at home the evening before jury deliberations began. According to an affidavit later filed by the juror, Ms. Dillon, Ms. Kelly called her twice that night, asking about Ron Daniel. On each occasion, she asked the juror questions which would indicate that Ms. Kelly, who is in the used car business, would give the juror's son a break on a used car and reminded the juror to do what she could to help Ron Daniel. The juror did not report the conversations to the judge until several weeks after the trial was over or to the other jurors until after the verdict had been reached and the verdict forms signed. Once Ms. Kelly's conversations with the juror were discovered, the defendant's trial attorney and Ms. Dillon went separately to see Judge Canterbury. After discussing the incident with Ms. Dillon, Judge Canterbury stated that he believed no harm had occurred and refused to call a mistrial. The appellant's trial attorney decided not to request a formal hearing, but appellate counsel appealed. Thus, the issue is whether it is per se reversible error for a witness to contact a juror in a party's behalf when the trial judge found no evidence of prejudice.

■ The appellant points to a single case which presumes prejudice to reverse conviction on jury tampering. In *State v. Burkhart*, 615 S.W.2d 565 (Mo.App.1981), the Missouri court held that reversal was required without considering the content of a conversation that occurred after a case had been submitted for jury deliberation when there was proof that the conversation occurred between a prosecution witness and a juror. The appellant urges the adoption of this approach in order to avoid injustice.

By contrast, the West Virginia Supreme Court has ruled that "[m]isconduct of a juror, prejudicial to the complaining party, is sufficient reason to direct a mistrial or to set aside a verdict returned by the jury of which he is a member." Syl. pt. 3, *Legg v. Jones*, 126 W.Va. 757, 30 S.E.2d 76 (1944). In *Legg*, the wife of one of the defendant's attorneys invited a juror to spend the night at the attorney's home. The juror apparently accepted the invitation prior to the rendering of the jury verdict. The plaintiff eventually received judgment, but in an unsatisfactory amount. Three months after the return of the jury verdict, the plaintiff filed a petition in the trial court regarding the alleged misconduct of the juror. In discussing the necessity of proving prejudice, the Court ruled that:

> Upon a clear and satisfactory showing of misconduct by a juror induced, or participated in, by an interested party, no proof is required that the misconduct resulted in prejudice to the complaining party. Prejudice is presumed and unless rebutted by proof the verdict will be set aside. Flesher v. Hale, 22 W.Va. 44. But where such misconduct is induced by a stranger, or a person having no interest in the litigation, unless manifestly prejudicial, the effect thereof must be established by proof.

*Id.* 126 W.Va. at ——, 30 S.E.2d at 80.

In the case now before us, Betty Kelly had no interest in the trial apart from her apparent concern for the appellant. No evidence was presented that the appellant induced her to act in his behalf and, indeed, if so, we question whether the appellant should be able to benefit with a mistrial for his misconduct.[2] Regardless, our analysis of *Legg* requires that the appellant establish that the contact was "manifestly prejudicial" to the appellant's interests. After reviewing the evidence of record, we do not find that the appellant has sustained this burden of proof.

---

**2.** Further, at syllabus point 4, the *Legg* Court stated:

A litigant cannot avail himself of the misconduct of a juror as a ground for setting aside the finding of a jury, when it appears that his attorneys knew or had reason to know of such misconduct for a sufficient time before rendition of the verdict in which to apprise the trial court thereof.

In this situation, no evidence was presented that would show the defense counsel knew of Ms. Kelly's misconduct.

The United States Supreme Court has also ruled that a defendant must show prejudice. In *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), the Court found that:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable. The safeguards of juror impartiality, such as *voir dire* and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations *may* be properly made at a hearing like that ordered in *Remmer* [v. United States, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954)] and held in this case.

*Id.* 455 U.S. at 217, 102 S.Ct. at 946, 71 L.Ed.2d at 86 (emphasis added). Although a determination of whether the contact was prejudicial is properly made at a hearing at which the moving party has the opportunity to prove prejudice, in this case the appellant's trial counsel chose not to request a formal hearing.[3] We find the lack of a formal hearing to be harmless error.[4]

In *State v. Johnson*, 111 W.Va. 653, 164 S.E. 31 (1932), the Court stated that:

> A motion for a new trial on the ground of the misconduct of a jury is addressed to the sound discretion of the court, which as a rule will not be disturbed on appeal where it appears that defendant was not injured by the misconduct or influence complained of. The question as to whether or not a juror has been subjected to improper influence affecting the verdict is a fact primarily to be determined by the trial judge from the circumstances, which must be clear and convincing to require a new trial; proof of mere opportunity to influence the jury being insufficient. (Emphasis added.)

*Id.* at syl. pt. 7. After reviewing the evidence and the affidavit, we cannot find that Judge Canterbury abused his discretion in refusing to declare a mistrial.

There is no question that the juror should not have spoken with Ms. Kelly. It is a primary rule in any proceeding that a jury must deliberate free of outside influence. *See Dower v. Church*, 21 W.Va. 23 (1882). Furthermore, there is no question that, regardless of whether they actually discussed the case, the juror should have reported the incident immediately to the court. However, while her actions in failing to report the misconduct of Ms. Kelly were most improper, they were not prejudicial. She did not inform the rest of the jury until after a decision had been reached, and the result that was eventually reached was not that intended by Ms. Kelly. Moreover, it was the appellant who moved for a mistrial based upon jury tampering, yet any tampering was done in his favor and the result clearly shows the effort to be ineffective. Finally, we point out that although the appellant's trial counsel did not request a hearing, Judge Canterbury thoroughly investigated the situation after discussing the case with the appel-

---

**3.** *See Meadows v. Holland*, 831 F.2d 493, 498 (4th Cir.1987), *cert. granted and judgment vacated*, 489 U.S. 1049, 109 S.Ct. 1306, 103 L.Ed.2d 575 (1989). The West Virginia Supreme Court has generally treated a failure to object to trial errors as a default of any right to assert these errors on direct appeal or habeas corpus. *See also State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983).

**4.** In *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the Court held that a trial judge, following an allegation of jury contact, should "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.* at 230, 74 S.Ct. at 451, 98 L.Ed. at 656.

We note that the Supreme Court in *Phillips* held that such determinations "may", not "shall", be made at a *Remmer*-type hearing. Thus, we do not believe that a hearing is mandatory, although we believe that the better rule is to hold such a hearing, with all parties present and a record made, when there are allegations of jury tampering in order to fully consider any evidence of influence or prejudice.

lant's trial attorney and juror Dillon. Only then, after determining that juror Dillon had not been influenced by the contact, did he rule that mistrial was not necessary. Absent a showing of prejudice by the moving party, it is within the sound discretion of the trial court to refuse to call a mistrial.[5]

## II.

The appellant's next allegation of error involves whether the court can permit a jury to infer malice and deliberation from the intentional use of a deadly weapon in light of a citizen's right to keep and bear arms.

 It has long been a rule in this jurisdiction that malice can be inferred from the intentional use of a deadly weapon. In *State v. Ferguson,* 165 W.Va. 529, 270 S.E.2d 166 (1980), *overruled on other grounds, State v. Kopa,* 173 W.Va. 43, 311 S.E.2d 412 (1983), this Court held that "[m]alice, wilfulness and deliberation, elements of the crime of the first degree murder, may be inferred from the intentional use of a deadly weapon." *Id.* at syl. pt. 2. *See also State v. Gunter,* 123 W.Va. 569, 17 S.E.2d 46 (1941). In *State v. Roush,* 95 W.Va. 132, 120 S.E. 304 (1923), this Court ruled that homicide maliciously committed is murder. The most difficult part of this equation is determining what constitutes malice. In order to prove first-degree murder, it must be shown that the homicide was willful, deliberate, and premeditated. *State v. Hobbs,* 37 W.Va. 812, 17 S.E. 380 (1893). We have also held that there is no particular length of time for which the defendant must have the intent to kill for the act to be willful, deliberate, and premeditated. If homicide is committed after deliberation and premeditation occur, the killing is first-degree murder even if the deliberation and premeditation occurred but a moment or an instant before

the act. *State v. Burdette,* 135 W.Va. 312, 63 S.E.2d 69 (1950).

Thus, malice and deliberation can be properly inferred from the intentional use of a deadly weapon. The defendant below, however, argues that the "Right to Keep and Bear Arms" amendment to the West Virginia Constitution and this Court's opinion in *State ex rel. City of Princeton v. Buckner,* 180 W.Va. 457, 377 S.E.2d 139 (1988), throws a different light on the propriety of that instruction.

The "Right to Keep and Bear Arms" amendment to Article III, § 22 of the West Virginia Constitution was approved by the voters on November 4, 1986. The amendment provides that "a person has the right to keep and bear arms for the defense of self, family, home and state, and for lawful hunting and recreational use." This Court recently interpreted that amendment in *Buckner,* which held that a statutory proscription against carrying dangerous or deadly weapons was overbroad and violated the "Right to Keep and Bear Arms" Amendment to the Constitution. However, the Court also noted that:

> our holding above in no way means that the right of a person to bear arms is absolute.... Other jurisdictions concluding that state statutes or municipal ordinances have violated constitutional provisions guaranteeing a right to bear arms for defensive purposes, though not specific in what ways this is to be done, have recognized that a government may regulate the exercise of the right, provided the regulations or restrictions do not frustrate the guarantees of the constitutional provision.

*Id.* 180 W.Va. at 463, 377 S.E.2d at 145 (citations omitted). Thus, the Court concluded that "the State, through exercise of its police power, is vested with the authority to enact laws, within constitutional limits, to promote the general welfare of its

---

5. *See Haight v. Goin,* 176 W.Va. 562, 346 S.E.2d 353 (1986), where this Court ruled that the trial court did not abuse its discretion in concluding that no prejudice resulted from the juror's misconduct in discussing a case with a trial specta-tor during trial and deliberations and that a new trial was not required on the liability issue. *See also Jones v. Bennett,* 290 S.C. 96, 348 S.E.2d 365 (S.C.App.1986).

citizenry." *Id.* 180 W.Va. at 464, 377 S.E.2d at 146 (citations omitted).

■ West Virginia Code § 61–7–1 *et seq.* (1989) represents the State's legitimate exercise of its police power. West Virginia Code § 61–7–11 makes it unlawful for any person armed with a firearm or other deadly weapon, whether licensed or not, "to carry, brandish, or use such weapon in a way or manner to cause, or threaten, a breach of the peace."

■ Based upon the foregoing, we do not find that the use of a *Ferguson* inference violates a citizen's constitutional right to keep and bear arms. That citizen still has the right to bear and keep the firearm in question, assuming that it does not violate a properly enacted state regulation. However, nothing in that constitutional amendment gives that citizen the right to use that weapon unlawfully, as described in W.Va.Code § 61–7–11. In this case, the jury obviously did not believe the appellant's claim of self-defense. The use of the *Ferguson* inference does not frustrate a citizen's right to keep and bear arms and thus, we find the argument to be without merit.

### III.

■ The appellant next argues that he was denied effective assistance of counsel at the trial level in violation of Article III, § 14 of the Constitution of West Virginia. The appellant contends that trial counsel's decision to put Betty Kelly on the witness stand was the equivalent of ineffective assistance of counsel. Betty Kelly's testimony was intended to impeach Sophia Police Chief Roush regarding the drugs found near Torrence's van and a conversation he had with Ms. Kelly prior to trial. Unfortunately for the appellant, Ms. Kelly was impeached at trial, with evidence being presented that she had forged her husband's name on a bond that would release Daniel from jail. Ms. Kelly also had a prior drug-related criminal record that was brought out upon cross-examination. Because of her lack of credibility, Daniel's appellate counsel argued that it was ineffective assistance of counsel for the trial attorney to put Ms. Kelly on the stand.

We are not persuaded by this assertion and find no ineffective assistance of counsel.

■ The elements necessary to maintain a claim of ineffective assistance of counsel are found in *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974). In *Thomas,* this Court held that a party alleging ineffective assistance of counsel must prove by a preponderance of the evidence that "no reasonably qualified defense attorney would have so acted in the defense of an accused" where the actions involve tactics, strategy, or arguable courses of action. *Id.* 157 W.Va. at 663, 203 S.E.2d at 461. A proven counsel error which resulted in the deprivation of a constitutional right would be considered harmless only if there is no reasonable possibility that the error contributed to the conviction. *Id.*

After reviewing the trial transcript, we cannot say that no reasonably qualified defense attorney would have put Ms. Kelly on the stand. Rather, the choice appears to be a question of trial strategy, given her personal knowledge of Torrence's drug history with relation to the drugs that were found near his van. We also note that there did not appear to be many witnesses available for use on the appellant's behalf. While perhaps unwise in light of the prosecution's enumeration of her various drug charges, Ms. Kelly still claimed personal knowledge about Torrence's background. More importantly, the defense has not shown that if it was an error to put her on the stand, the error contributed to his conviction. In fact, the drug testimony was largely irrelevant to the case-in-chief, since the appellant was not charged with drug possession and no drug test was ever performed on him that would make the finding of drugs in or near the vehicle relevant. Consequently, we cannot conclude that no other reasonably qualified defense attorney would have acted in the same manner or that, if considered an error, it contributed to the verdict.

### IV.

The appellant next asserts that the State's Instructions Nos. 4 and 5 unconstitutionally shifted the burden of proof upon

the defendant in the following manner. State Instruction No. 4 provides that:

> The court instructs the jury that where a defendant relies upon a claim of accidental killing or wounding as his defense to murder or malicious wounding, you may only consider that claim of accidental killing in your deliberations if you are convinced that the defendant has presented evidence demonstrating such defense to an appreciable degree.
>
> If no such credible evidence has been presented, then you should find that the killing of Walter Dale Morgan and the wounding of Cecil Miller were not accidental.

State Instruction No. 5 provides, in part, that:

> You are further instructed that unless there is credible evidence that the defendant acted in self-defense in shooting Cecil Miller and Walter Dale Morgan, the State has no burden of proving the absence of self-defense beyond a reasonable doubt.[6]

Thus, the appellant argues that because the instructions require the appellant to present *credible* evidence convincing the jurors that the killing or wounding was accidental, the burden was improperly shifted to the defense in contradiction of the Fourth Circuit's opinion in *Adkins v. Bordenkircher*, 674 F.2d 279 (4th Cir.1982), *cert. denied* 459 U.S. 853, 103 S.Ct. 119, 74 L.Ed.2d 104 (1982), *overruled on other grounds, Meadows v. Holland*, 831 F.2d 493 (4th Cir.1987). The appellant contends that *Adkins* precludes placing the burden of proving the elements of self-defense or accidental wounding on the defendant as an impermissible shifting of the burden of proof.

In *Adkins*, the Fourth Circuit struck down an alibi instruction which placed the burden upon the defendant to prove the defense of alibi to "such a degree of certainty, as will when the whole evidence is considered, create and leave in the mind of the jury a reasonable doubt as to the guilt of the accused." *Id.* at 280. In reaching that conclusion, the Fourth Circuit found that an alibi was not an affirmative defense since it negated every fact that the State was required to prove. *Id.* at 282. Consequently, the court determined it was improper to place the burden of persuasion upon the defendant to prove the alibi to the jury's satisfaction.

Shortly thereafter, this Court reviewed a similar instruction involving an alibi defense in *State v. Kopa*, 173 W.Va. 43, 311 S.E.2d 412 (1983). The alibi instruction, known as an *Alexander* instruction, required the defendant to prove his alibi defense so that it created a reasonable doubt in the mind of the jury as to the defendant's guilt. Although this Court followed the result reached in *Adkins* in deference to the Fourth Circuit, we noted that:

> For reasons we have stated in this opinion, we believe that [*Adkins*] reached an incorrect result when it held the alibi instruction contained in *Alexander* to be constitutionally defective under either the *Mullaney* [*v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)] approach or the *Sandstrom* [*v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979)] approach. In any event, if we choose to disregard the opinion of the court in *Adkins*, we would create the problem of sustaining convictions in the state court with predictable release through habeas corpus in the federal court.
>
> Accordingly, we hold that because of the holding in *Adkins v. Bordenkircher, supra, State v. Alexander, supra*, is overruled to the extent that it permits the giving of an instruction that places the burden upon the defendant to prove his alibi defense so that it creates a reasonable doubt in the mind of the jury as to his guilt.

173 W.Va. at 49, 311 S.E.2d at 418.

The appellant contends that, based upon *Adkins* and *Kopa*, the lower court improp-

---

**6.** We note that the defendant was given a self-defense instruction compatible with syllabus point 4 of *State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374 (1978), to the effect that once the defendant raises a reasonable doubt on the self-defense issue, the State must prove the lack of self-defense beyond a reasonable doubt. Had the defense instruction not been allowed, the State's instruction in this case would present a more serious problem.

erly shifted the burden to prove self-defense and accidental killing or wounding to the appellant and a new trial is required. The present situation, however, can be distinguished from both *Adkins* and *Kopa* by the mere fact that the instructions involve the affirmative defenses of self-defense and accidental killing or wounding, rather than the alibi defense specifically held not to be an affirmative defense in *Adkins*. Thus, a separate review of the burden of persuasion involving an affirmative defense is necessary.

■■■ It is well established that the prosecution must prove every element of the crime charged beyond a reasonable doubt. *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Therefore, any instruction that places any part of this burden upon a criminal defendant is an improper shifting of the burden of proof.

However, a defendant can be required to prove the affirmative defenses that he asserts. *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). In *Patterson*, the jury was instructed that the defendant had to prove his affirmative defense of "extreme emotional disturbance" by a preponderance of the evidence. The United States Supreme Court held that to require the defendant to prove "extreme emotional disturbance" was comparable to the defendant providing proof of the insanity defense because it "constitutes a separate issue on which the defendant is required to carry the burden of persuasion...." *Id.* at 207, 97 S.Ct. at 2325, 53 L.Ed.2d at 290. Specifically, the Court held that:

> We thus decline to adopt as a constitutional imperative, operative countrywide, that a State must disprove beyond a reasonable doubt every fact constituting any and all affirmative defenses.... Proof of the nonexistence of all affirmative defenses has never been constitutionally required; and we perceive no reason to fashion such a rule in this case and apply it to the statutory defense at issue here.

*Id.* at 210, 97 S.Ct. at 2327, 53 L.Ed.2d at 292.

More recently, in *Martin v. Ohio*, 480 U.S. 228, 107 S.Ct. 1098, 94 L.Ed.2d 267 (1987), the Court addressed the specific issue of whether the due process clause forbids placing the burden to prove self-defense on the defendant in a murder case by a preponderance of the evidence. In that case, the defendant argued that placing the burden of proving an affirmative defense on the defendant improperly required her to disprove elements of the prosecution's case of murder. The Supreme Court disagreed, holding that it was permissible to require the defendant to prove self-defense because

> Ohio does not shift to the defendant the burden of disproving any element of the State's case. When the prosecution has made out a *prima facie* case and survives a motion to acquit, the jury may nevertheless not convict if the evidence offered by the defendant raises any reasonable doubt about the existence of any fact necessary for the finding of guilt. Evidence creating a reasonable doubt could easily fall short of proving self-defense by a preponderance of the evidence.

*Id.* at 234, 107 S.Ct. at 1102, 94 L.Ed.2d at 274–75. The *Martin* Court stressed that, while the defendant carried the burden of proving self-defense by a preponderance of the evidence, the State was also required to prove each element of murder beyond a reasonable doubt.

■■■ In the case now before us, the appellant's assertion that it was improper to require the defendant to present evidence demonstrating self-defense or accidental killing or wounding is without merit. Like the requirement of proving "extreme emotional disturbance" in *Patterson* or self-defense in *Martin*, the instructions in this case do not reduce the burden of proof placed upon the prosecution to prove all elements of the crime beyond a reasonable doubt, nor do they assign an insurmountable burden to the defendant. The appellant dwells, however, on the fact that he is required to present "credible evidence" to

the jury regarding his claims of accidental killing or wounding and self-defense. While perhaps unartfully worded, we do not believe the use of the word "credible" renders these instructions invalid. For evidence to be credible, it must merely be believable.

Therefore, we conclude that a court may properly require a defendant to present evidence which raises a reasonable doubt on the affirmative defense asserted as long as the prosecution is required to prove each element of the crime charged beyond a reasonable doubt. *State v. Kirtley*, 162 W.Va. 249, 252 S.E.2d 374 (1978). As the United States Supreme Court found in *Martin*, the mere fact that there is some overlap in the proof between murder and self-defense will not render the instruction constitutionally infirm. *Id.* at 234, 107 S.Ct. at 1102, 94 L.Ed.2d at 274.

### V.

The final assignment of error to be addressed involves the appellant's allegation that the evidence did not support the verdict of first-degree murder and malicious wounding and the related argument that the lower court misinterpreted the concept of transferred intent.

■ The doctrine of transferred intent can be described by stating that when one party shoots at another with the intent to kill, and accidentally kills a third party, the same intent will be transferred to the killing of the third party. Syl. pt. 8, *State v. Meadows*, 18 W.Va. 658 (1881). *See also State v. Hall*, 174 W.Va. 599, 328 S.E.2d 206, 209 n. 2 (1985); *State v. Currey*, 133 W.Va. 676, 57 S.E.2d 718 (1950).

In the present case, the appellant argues that intent cannot be transferred because the facts do not show that the defendant shot at one person whom he intended to kill and missed, accidentally hitting a third party. Rather, he argues that since the appellant had no intent to kill in the first place, there could be no intent to transfer. By contrast, the State argues that the facts show that the appellant did not shoot in self-defense and that he intended to shoot at either Morgan or the group of "threatening men" in the back of the van.

■ A review of the evidence presented in this case makes it clear to this Court that a jury could find that the defendant intended to shoot to kill or wound rather than just to warn. The testimony elicited from Bobby Lane, in which he recalled that the defendant was both awake and speaking with the decedent prior to the gunshots, contradicts the appellant's testimony that he was dazed and woke, frightened, to see a nameless group of threatening men coming towards him. Furthermore, Dr. Romero, the physician who treated Walter Dale Morgan before his death, testified that the bullet wounds were in Morgan's chest. This testimony tends to contradict the appellant's contention that he shot towards the floor. Finally, no evidence of ricochet was presented.

Therefore, we are not persuaded by the appellant's assertions that the concept of transferred intent was misapplied and that the evidence did not support the verdict. We believe that any reasonable jury could have reached the same conclusion as this jury.

Accordingly, for the aforementioned reasons, we affirm the verdict of the Raleigh County Circuit Court.

Affirmed.