**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

RONALD GENE DANIEL,
Petitioner-Appellant,

v.                                                    No. 97-6806

STATE OF WEST VIRGINIA,
Respondent-Appellee.

Appeal from the United States District Court
for the Southern District of West Virginia, at Beckley.
David A. Faber, District Judge.
(CA-96-33-5)

Argued: June 10, 1999

Decided: September 14, 1999

Before WILKINSON, Chief Judge, and
ERVIN and MICHAEL, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Ervin wrote the opinion, in
which Chief Judge Wilkinson and Judge Michael joined.

_____

**COUNSEL**

**ARGUED:** Neal Lawrence Walters, UNIVERSITY OF VIRGINIA
SCHOOL OF LAW APPELLATE LITIGATION CLINIC, Char-
lottesville, Virginia, for Appellant. Silas Bent Taylor, Deputy Attor-
ney General, Charleston, West Virginia, for Appellee. **ON BRIEF:**
Christopher Mizzo, Third Year Law Student, Michael Hadley, Third
Year Law Student, UNIVERSITY OF VIRGINIA SCHOOL OF

LAW APPELLATE LITIGATION CLINIC, Charlottesville, Virginia, for Appellant. Darrell V. McGraw, Jr., Attorney General, Dawn E. Warfield, Deputy Attorney General, Charleston, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

ERVIN, Circuit Judge:

Ronald Gene Daniel ("Daniel") appeals the denial of his petition for a writ of habeas corpus. See 28 U.S.C.A. § 2254 (West 1994 & Supp. 1999). A West Virginia jury convicted Daniel of first-degree murder and malicious wounding. After exhausting his state remedies, he filed a petition for a writ of habeas corpus in district court, alleging violations of his right to due process, right to remain silent, and right to effective assistance of counsel. The district court granted summary judgment to the State of West Virginia (the "State"). Finding no error, we affirm.

I.

Daniel was tried in the Circuit Court of Raleigh County, West Virginia, for first-degree murder and malicious wounding. During the trial, the prosecutor made references to Daniel's invocation of his Fifth Amendment right to remain silent on four separate occasions. Daniel's counsel failed to object properly to these references during trial. The first reference was made in the prosecutor's opening statement:

> Dr. Romaro will testify that likewise, as the law enforcement officers will, that although he had been injured and that although it was obvious that the Defendant had been drinking, he was not disoriented, in any way, and obviously

2

knew what was going on, he knew what he was saying. The Defendant is turned over to Detective Arthur Bolen, of the Raleigh County Sheriff's Department, Detective Bureau, and Detective Bolen, after again advising the Defendant of his constitutional rights, hears from the Defendant that the Defendant was scared for his life, and it was self-defense. So Detective Bolen says[:] "Well, who did this to you, what did they do to you?" Which you will hear that the Defendant had no response.

J.A. 54. The second reference was made during the direct examination of a police detective:

Prosecutor: And after you concluded reading the defendant his rights did he tell you his version of what happened and make a statement?

Detective: He said, "man, this was self-defense, I was afraid for my life."

Prosecutor: When the defendant said that, did you ask him a question about that?

Detective: Yes.

Prosecutor: What did you ask the defendant?

Detective: I said, "well, who did this to you," and he didn't respond. And I said, "well, what did they do that made you in fear for you[r] life," and he didn't respond other than to say, "just take me to jail."

J.A. at 55-56. The third reference was made during Daniel's cross-examination:

Prosecutor: And, do you recall Detective Bolen saying to you, "well who put you in fear of your life, what did they do to you?"

3

Daniel:  The reason I didn't tell him is because I really didn't know who had jumped on me, I did not know.

Prosecutor:  And was there a reason that you did not tell him the whole story about losing consciousness and thinking that these men were attacking you, and feeling in fear of your life, like a wounded animal?

Daniel:  I started telling him close to what happened but I really didn't remember everything that happened, and I couldn't tell him, because I didn't know, and when you tell somebody that this person did this or this person did that and it turned out that it didn't, that's, you know, I would have been lying to the man if I'd had told him that I knew who jumped on me, so that's the reason I never said nothing.

Prosecutor:  And in fact, Detective Bolen testified your response was, "just take me to jail," wasn't it?

Daniel:  Right, that's the only thing else, there was nothing else that I could answer to Mr. Bolen, except that I wanted to see an attorney.

Prosecutor:  When exactly had your memory come back, since you didn't have it on July 9th, 1988, when you were with the police?

Daniel: Could you repeat that question again?

Prosecutor: When did you remember exactly what happened, about passing out and not remembering, and the guys running towards you, and all this?

Daniel: That very morning.

4

Prosecutor: July 9th, 1988?

Daniel: Yes.

J.A. at 56-57. The fourth and final reference occurred during the prosecutor's closing argument:

> So the defendant, in [the town of] Sophia, sure isn't offering any information, he says nothing . . . . Detective Bolen said the defendant said, "I was in fear of my life." Detective Bolen said, "why, who put you in fear of your life[?]" What was the defendant's answer? "Take me to jail."
>
> Now, the last question that I asked the defendant on cross-examination, where he was claiming that the reason he didn't feel like talking to the Detective Bureau was because he was having a memory loss, do you remember? And I asked him, "when exactly did your memory return," he made a mistake there, he accidentally told the truth, and that was July 9th, that very morning.
>
> In fact, I submit to you that the reason the defendant did not want to stick around and talk to Detective Bolen once he knew that Detective Bolen [knew] that there was a body that had been left behind was that his memory was just fine. He needed a little time to think. That self-defense against Cecil and Jimmy just wasn't going to fly anymore, now he's had a little bit more time to think, so now he's modified his self-defense, and if you don't go with the self-defense that's in his statement, if they won't play anymore, well then, let's try an accident.

J.A. at 57-58.

At the conclusion of the trial, the trial judge gave, among others, the following instruction to the jury:

> The Court instructs the jury that the defendant, Ronald Gene Daniel, stands charged in Count I of the Indictment with first degree murder.

5

Malice is a subjective state of mind in the defendant. It may be proven by evidence of circumstances surrounding the crime, such as words or conduct of the defendant, or evidence of ill-will or a source of antagonism between the defendant and the deceased. Further, malice may be inferred by the intentional use of a deadly weapon. Also, it may be inferred from a deliberate cruel act against another, indicating a heart disregarding social duty, fatally bent on mischief.

To prove premeditation it is not necessary that the intention to kill existed for any length of time prior to the killing; it is only necessary that such intention should spring into the mind of the accused at the instant of such killing or any time prior thereto.

"Deliberation" means that the killing is deliberate: deliberation like malice, may be inferred when a deadly weapon is used.

Therefore, if you find from the evidence beyond a reasonable doubt that this defendant, Ronald Gene Daniel, intentionally, maliciously, deliberately, and with premeditation shot and killed Walter Dale Morgan, then you may find the defendant guilty of first degree murder as charged in Count I of the Indictment.

J.A. at 64. During trial, the only direct evidence of malice presented was testimony by one of Daniel's acquaintances that the night of the shooting, Daniel appeared perturbed that the victim had not come to Daniel's aid during a fight earlier that night.

The jury found Daniel guilty of both charges. He received consecutive sentences of ten years to life imprisonment on the murder conviction and 3-10 years imprisonment on the malicious wounding conviction.

Following the jury's verdict, Daniel's trial counsel learned that one of the defense witnesses, Betty Kelly ("Kelly"), had contacted one of the jurors, Carolyn Dillon ("Dillon"), during the course of the trial.

Prior to deliberations, Kelly had called Dillon twice one evening and offered Dillon's son a deal on a used car if she could do what she could to help Daniel. Instead of investigating the matter or requesting a hearing, Daniel's trial counsel just reported the incident to the trial court. After interviewing Dillon off the record, the trial court concluded that no harm had occurred.

Daniel appealed his conviction all the way to the Supreme Court of Appeals of West Virginia of Appeals, which affirmed on direct appeal. See State v. Daniel, 391 S.E.2d 90, 100 (W. Va. 1990) ("Daniel I"). Daniel then pursued post-conviction state habeas corpus remedies in the Circuit Court of Raleigh County. He received new postconviction counsel and was granted an omnibus habeas corpus hearing.

At this omnibus habeas corpus hearing, Dillon, the juror who claimed to have been contacted by Kelly, testified that the night before jury deliberations, Kelly called her twice in an attempt to elicit help for Daniel. The next day, after the jury had deliberated and reached a verdict, Dillon informed the other members of the jury about these conversations. Dillon then learned that Kelly had also contacted another member of the jury. Dillon never informed the trial court about this second juror. When asked why, she answered because the trial court had never inquired about the other juror. Dillon further testified that she felt "set-up" by Kelly and Daniel. She knew that Kelly and Daniel were romantically involved and"felt like they had got together and said, hey, we'll just use her."

The Circuit Court denied Daniel habeas relief. The Supreme Court of Appeals of West Virginia affirmed. See State ex rel. Daniel v. Legursky, 465 S.E.2d 416, 431 (W. Va. 1995) ("Daniel II").

Having exhausted all of his state remedies, Daniel filed the present petition for a writ of habeas corpus in the United States District Court for the Southern District of West Virginia. The petition was initially referred to a magistrate judge. The magistrate judge recommended that relief be granted on three of the eight claims raised in the petition. Both parties filed objections to the magistrate judge's recommendations. After reviewing these objections, but without conducting a hearing, the district court sustained the State's objections and over-

7

ruled Daniel's objections, granting summary judgment to the State and denying Daniel's petition. Daniel filed a motion for a certificate of appealability, which the district court granted. He then appealed to this Court.

II.

Daniel raises four questions on appeal. First, did the jury instructions allow the jury to make an unwarranted permissive inference of malice and deliberation from the use of a deadly weapon, thus violating Daniel's right to due process? Second, did the prosecutor's references to Daniel's silence during police questioning violate his right to remain silent? Third, did the decision of Daniel's trial counsel not to request a hearing concerning alleged juror misconduct violate Daniel's right to effective assistance of counsel? Fourth, did the cumulative effect of all of these alleged constitutional errors deprive Daniel of a fair trial?

A.

The first issue is whether the jury instructions created a permissive inference that violated Daniel's constitutional right to due process. A permissive inference contains both a basic fact and an elemental fact. The basic fact is what the prosecution must first prove to allow the permissive inference. The elemental fact is a fact critical to proving an element of the charged crime. When the prosecution proves the basic fact contained in the permissive inference, the jury is permitted, but not required, to infer proof of the elemental fact. See County Court of Ulster County, New York v. Allen, 442 U.S. 140, 157 (1979). "Because this permissive presumption leaves the[jury] free to credit or reject the inference and does not shift the burden of proof, it affects the application of the `beyond the reasonable doubt' standard only if, under the facts of the case, there is no rational way the [jury] could make the connection permitted by the inference." Id.

First, we must determine whether the challenged jury instruction contained a permissive inference. The challenged jury instruction stated that malice "may be inferred by the intentional use of a deadly weapon." This instruction allowed an inference of "malice," an elemental fact of first-degree murder, from the proof of the basic fact,

8

"the intentional use of a deadly weapon." Thus, the instruction clearly contained a permissive inference.

Second, we must determine whether this permissive inference is constitutional. A permissive inference is constitutional "so long as the presumed fact is rationally connected to a proven fact." Davis v. Allsbrooks, 778 F.2d 168, 172 (4th Cir. 1985). The question is whether the inferred conclusion is one that "reason and common sense justify in light of the proven facts before the jury." United States v. Warren, 25 F.3d 890, 897 (9th Cir. 1994). We review the constitutionality of a jury instruction containing a permissive inference on a case-by-case basis. Allen, 442 U.S. at 157.

Daniel argued that given the dearth of evidence of malice in this case the inference of malice contained in the challenged jury instruction was not rationally connected to any proven facts. In support, Daniel cited the Supreme Court of Appeals of West Virginia's comment that "the only evidence tending to show premeditation and deliberation" was the testimony of Daniel's acquaintance that, "prior to the shooting, the petitioner appeared perturbed that [the victim had] failed to help him in the fight . . . ." Daniel II, 465 S.E.2d at 423. Nevertheless, the Supreme Court of Appeals of West Virginia upheld the challenged jury instruction as constitutional, reasoning that

> [i]t makes absolutely no difference whether we on the appellate bench as jurors would have voted to convict the defendant of a lesser-included offense or whether we would have thought there was some reasonable doubt. To the contrary, the question . . . is whether any rational jury could on the evidence presented think the defendant premeditated and intentionally killed the victim. We do not find the evidence so weak as to render the verdict irrational.

Id. at 423-24 (citations omitted).

We concur with the holding of the Supreme Court of Appeals of West Virginia. While the direct evidence may not have been overwhelming, there was sufficient circumstantial evidence from which a rational jury may have concluded that Daniel acted with malice when he intentionally used a deadly weapon. We therefore hold that the per-

9

missive inference of malice in the challenged jury instruction was constitutional.

B.

The second issue is whether the prosecutor's references during trial to Daniel's silence during police questioning violated his right to remain silent.

The threshold question is whether this claim is procedurally barred by an independent and adequate state ground. Since Daniel's counsel failed to object properly to the prosecutor's references to Daniel's silence, the State argues that this issue was procedurally defaulted and thereby barred from federal habeas review. The State strictly enforces a "raise or waive" procedural rule in its courts that requires trial counsel to object contemporaneously to a possible error or lose the ability to raise that error on appeal. State v. Miller , 476 S.E.2d 535, 544 (W. Va. 1996). This rule is founded upon the State's interest in furthering "fairness, judicial economy, and practical wisdom" in its state courts. Id.

We have already recognized that West Virginia's contemporaneous objection rule "constitutes an `adequate and independent state ground' upon which federal review may be precluded." Meadows v. Legursky, 904 F.2d 903, 906 (4th Cir. 1990), superseded on other grounds by Trest v. Cain, 118 S.Ct. 478, 480 (1997). The question, therefore, is not whether there is an independent and adequate state ground barring our review -- for there clearly is such a ground-- but rather, whether the Supreme Court of Appeals of West Virginia relied upon this independent and adequate state ground when ruling on this issue. See Skipper v. French, 130 F.3d 603, 609 (4th Cir. 1997) ("[I]t is not sufficient that the state court could have applied a procedural default under state law; it must actually have done so.").

Although Daniel properly raised this issue before the Supreme Court of Appeals of West Virginia, it is unclear whether the Supreme Court of Appeals of West Virginia addressed it on the merits or concluded that it was procedurally barred. In Skipper v. French, this Court outlined an analytical framework to follow when attempting to

10

determine from ambiguous evidence whether or not a state court addressed the merits of a federal constitutional claim:

> In analyzing the state court decision . . ., we look first to its text -- which may be dispositive. If it is not . .. we may look to the procedural posture of the decision, including the motion papers before the court . . . and, if available, any factually relevant precedent.

130 F.3d at 611 (citations omitted).

Unfortunately, even after such analysis, the basis of the Supreme Court of Appeals of West Virginia's ruling remains ambiguous. All the Supreme Court of Appeals of West Virginia stated in its published opinion was, "We find his remaining assignments of error are without merit." Daniel II, 465 S.E.2d at 420. Our examination of the motion papers and analogous precedent was equally inconclusive. Thus, we decline to find this issue procedurally barred and address its merits.

Daniel argues that the prosecutor's four references to his silence during trial violated his right to remain silent. Relying on Doyle v. Ohio, 426 U.S. 610, 619 (1976), he argues that he is entitled to a new trial. We disagree.

The United States Supreme Court has long distinguished between the use of silence to prove a defendant's guilt and the use of silence to impeach a defendant's credibility. See Anderson v. Charles, 447 U.S. 404, 408 (1980) ("But Doyle does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks . . . has not been induced to remain silent."). Daniel is correct that the prosecution is forbidden from using his silence as substantive evidence of his guilt. See Doyle, 426 U.S. at 619. That is not, however, what happened in this case. After reviewing the record, we conclude that the prosecution commented on Daniel's silence only in an effort to impeach his credibility. The prosecution merely sought to demonstrate the discrepancy between Daniel's original explanation -- that he acted in self-defense -- and his subsequent explanation given at trial -- that the shooting was an accident. Daniel opened the door to such impeachment when he exer-

11

cised his right to testify. United States ex rel. Savory v. Lane, 832 F.2d 1011, 1017-18 (7th Cir. 1987) ("The cases which have allowed impeachment by silence rely on the fact that the defendant opens himself to impeachment by taking the stand."). We therefore conclude that the prosecutor's comments on Daniel's silence were proper and within constitutional bounds.

C.

The third issue is whether the decision of Daniel's trial counsel not to request a hearing concerning the alleged jury tampering constituted ineffective assistance of counsel. To establish ineffective assistance of counsel, Daniel must satisfy the two-pronged test of Strickland v. Washington: (1) was Daniel's representation below an objective standard of reasonableness, and, if so, (2) is there a reasonable probability that, but for the unprofessional errors of Daniel's trial counsel, Daniel's trial would have had a different result? 466 U.S. 668, 687 (1984). We review this issue de novo. See Smith v. Moore, 137 F.3d 808, 817 (4th Cir. 1998).

First, did the conduct of Daniel's trial counsel fall below an objective standard of reasonableness? After thoroughly examining the trial record and subsequent testimony at the habeas hearing, the Supreme Court of Appeals of West Virginia commented that the failure of Daniel's counsel to request a hearing was "incomprehensible." Daniel II, 465 S.E.2d at 425. The Supreme Court of Appeals of West Virginia could "imagine no scenario excusing this failure" and concluded that it was "not objectively reasonable." Id. We agree with the Supreme Court of Appeals of West Virginia that the conduct of Daniel's trial counsel fell below an objective standard of reasonableness. Since we conclude that Daniel has satisfied the first prong of the Strickland test, we now address the second prong.

Second, we agree with the Supreme Court of Appeals of West Virginia, the district court, and the magistrate judge that Daniel failed to show that any actual prejudice resulted from counsel's unprofessional conduct. Daniel argues that because his ineffective assistance of counsel claim involves jury tampering, he is entitled to a presumption of prejudice. See Remmer v. United States, 347 U.S. 227, 229 (1954); Haley v. Blue Ridge Transfer Co., 802 F.2d 1532, 1535 (4th Cir. 1986).

12

We believe that Daniel is confusing his current claim -- that his trial counsel was ineffective for failing to request a <u>Remmer</u> hearing -- with one of his earlier claims -- that he was entitled to a mistrial because of jury tampering. Daniel already made (and lost) this same argument for presumptive prejudice in front of the Supreme Court of Appeals of West Virginia with regard to the earlier mistrial claim. <u>See</u> <u>Daniel I</u>, 391 S.E.2d at 93-96. Because Daniel never raised this mistrial claim in federal court, this argument is barred and the <u>Strickland</u> standard of actual prejudice controls.

Moreover, Daniel has already received the only remedy he would have been entitled to had his trial counsel been effective, namely a hearing on the alleged jury tampering. Daniel responds that the state habeas hearing was deficient because no factual findings were made to rebut the <u>Remmer</u> presumption of prejudice. As explained above, however, since Daniel never raised the mistrial issue before this Court, he is not entitled to such factual findings. Any legal inadequacies of the hearing would only have been relevant to the question of a mistrial and not to the question of trial counsel's effectiveness. Finding no actual prejudice, we reject Daniel's ineffective assistance of counsel claim.

D.

The fourth issue is whether the "cumulative effect" doctrine applies here. Cumulative effect analysis only applies where there are two or more actual errors, not to the cumulative effect of non-errors. <u>See</u> <u>Hoxsie v. Kerby</u>, 108 F.3d 1239, 1245 (10th Cir. 1997). Since Daniel has not shown that the district court committed any actual error, we are not persuaded that "the entire trial was so fundamentally unfair that [Daniel's] due process rights were violated." <u>Id.</u>

III.

Finding no error in the district court's denial of Daniel's petition for a writ of habeas corpus, we affirm.

<u>AFFIRMED</u>