408 S.E.2d 1

**STATE of West Virginia, Plaintiff below, Appellee,**

v.

**Rubin (Skeeter) JULIUS, Defendant below, Appellant.**

No. 19836.

Supreme Court of Appeals of West Virginia.

Submitted May 8, 1991.

Decided July 3, 1991.

James P. Carbone, Atty. General's Office, Charleston, for appellee.

John W. Bennett, Eiland & Bennett, Logan, for appellant.

MILLER, Chief Justice:

The defendant, Rubin "Skeeter" Julius, appeals from an order of the Circuit Court of Logan County, dated October 3, 1989, denying his motion for a new trial. We reverse his conviction of arson, affirm his convictions of attempted murder, felony-murder, and malicious assault, and remand the case for resentencing.

## I.

### FACTS

On the night of March 1, 1988, at approximately 10:00 p.m., a fire swept through a two-story apartment building in Man, West Virginia. Residing in the building were Columbus Bartram, his wife and three children, and Jackie Vance and her two sons and daughter.

The State's evidence revealed that earlier in the evening, the defendant and Columbus Bartram had a fist fight outside of a game room in Man. Officer Barry Browning of the Man City Police Department broke up the fight and told the two men to go their separate ways. As Officer Browning walked away, he heard the defendant threaten to kill Mr. Bartram before the night was over.

Shortly thereafter, Raymond Muncey gave the defendant a ride into Man. The defendant appeared intoxicated and was carrying a plastic milk jug which contained an orange liquid that looked and smelled like gasoline. As the defendant got out of Mr. Muncey's car, he said that his name was Rubin G. Julius.

George Fields testified that around 10:00 p.m., he saw the defendant walking in the direction of the apartment building that caught fire that night. He also noticed that the defendant was wearing an army jacket and carrying a milk jug that contained an orange liquid.

At approximately 9:45 p.m., Columbus Bartram's next-door neighbor, Benny Blankenship, saw the defendant standing outside of Mr. Bartram's apartment building. Mr. Blankenship testified that the defendant was wearing an army fatigue jacket and carrying a plastic jug. About fifteen minutes later, Mr. Blankenship saw the defendant with the milk jug still in his hand run down the stairs of the two-story building. Next he saw fire in the stairwell. When Mr. Blankenship yelled at the defendant, he fled up the alley and threw the milk jug in a nearby creek.

Officer Emerson Whitlock of the Man City Police Department was the first police officer to arrive at the scene. He immediately learned what Mr. Blankenship had seen and retrieved the milk jug from the creek. The jug smelled of gasoline.

The fire totally destroyed the second story of the apartment building. The Bartram family escaped unharmed. Jackie Vance died of smoke inhalation and her son, Joseph Vance, was severely burned before he was able to escape out of the kitchen window. Her other son, Gideon, as well as her daughter, Casandra, were not harmed.

Based on the evidence he had gathered at the scene, Officer Whitlock obtained a warrant for the defendant's arrest. Around 5:00 a.m. on March 2, 1988, Officer Whitlock and several other police officers went to the defendant's trailer in the Green Valley Subdivision. There they found the defendant partially dressed and asleep on the couch. As the officers entered the trailer, they immediately asked the defendant where the jacket was. Hanging on a kitchen chair in plain view was a camouflage jacket. The police seized it and ordered the defendant to get dressed.

The police transported the defendant to city hall to await arraignment. While they were waiting, James Layne of the State Fire Marshal's Office advised the officers to seize the defendant's clothing because it might contain evidence of a flammable liquid. The officers agreed, seized the defendants clothes, and provided him with a substitute set.

On May 17, 1988, the defendant was indicted by the Logan County grand jury. Following a two-day trial, the defendant was convicted of first degree murder with mercy in violation of W.Va.Code, 61–2–1 (1987); attempted murder in violation of W.Va.Code, 61–11–8 (1966); arson in the first degree in violation of W.Va.Code, 61–3–1; and malicious assault in violation of W.Va.Code, 61–2–9 (1978).

## II.

### SEIZURES OF EVIDENCE

The defendant contends that the seizure of his jacket and clothing violates the Fourth Amendment to the United States

Constitution[1] and Article III, Section 6 of the West Virginia Constitution[2] because the officers had not obtained a search warrant. We disagree.

## A.

### Clothes Seized In Search Incident to An Arrest

■ "One of the most frequently utilized exceptions to the warrant requirement is the search incident to an arrest." J. Cook, *Constitutional Rights of the Accused* § 322 at 494 (2d ed. 1985). Before a search will be upheld as a lawful search incident to an arrest, it must be both spatial and contiguous to the arrest. The leading case on this issue is *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). In *Chimel*, the police had an arrest warrant for the petitioner. When they arrived at his home, he was not there, but his wife invited them in. When the petitioner arrived home, he was promptly arrested, and the police asked if they could look around. Although the petitioner objected, the police searched throughout his house, garage, work shop, and attic. During the search, the police seized numerous items which were admitted into evidence at the petitioner's trial.

The United States Supreme Court found the seizure unconstitutional and then outlined the parameters of a lawful search incident to an arrest:

"When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape.... In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule.... There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." 395 U.S. at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694.

■ We recognized the holding in *Chimel* in Syllabus Point 6 of *State v. Moore*, 165 W.Va. 837, 272 S.E.2d 804 (1980):

"A warrantless search of the person and the immediate geographic area under his physical control is authorized as an incident to a valid arrest."

*See also State v. Hodges*, 172 W.Va. 322, 305 S.E.2d 278 (1983); *State v. Drake*, 170 W.Va. 169, 291 S.E.2d 484 (1982).

■ Nearly a decade later, the United States Supreme Court extended the boundaries of *Chimel* by holding: "[I]t is also plain that searches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." *United States v. Edwards*, 415 U.S. 800, 803, 94 S.Ct. 1234, 1237, 39 L.Ed.2d 771, 775 (1974).[3] *See also Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960). Under the principles of *Chimel* and *Edwards*, there is no question that the seizure of the defendant's clothes at city hall was a lawful search and seizure incident to his lawful arrest.

■ The same result is not true of the seizure of the jacket. The State did not

---

1. The Fourth Amendment to the United States Constitution provides:

   "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

2. Article III, Section 6 of the West Virginia Constitution is virtually identical to the Fourth Amendment to the United States Constitution.

3. In *Edwards*, the defendant was arrested for attempted burglary and incarcerated in the local jail. Investigation at the scene revealed that the intruder had attempted access into the building through a painted wooden window. The next day, the police seized the defendant's clothes. An analysis of the clothes revealed paint chips similar to those found on the window.

present any evidence that the jacket was within the immediate reach of the defendant at the trailer to show that its seizure was permissible under *Chimel.* However, as we discuss in Subpart B, *infra,* the seizure of the jacket was lawful under the plain view doctrine.

### B.

### *Plain View*

In the alternative, the State argues that even if the seizure of the jacket did not result from a lawful search incident to an arrest, it was permissible under the plain view doctrine. "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire,* 403 U.S. 443, 465, 91 S.Ct. 2022, 2037, 29 L.Ed.2d 564, 582 (1971). *See also Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). *See generally* J. Cook, *supra* at § 3:32.

"What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came *inadvertently* across a piece of evidence incriminating the accused.... Of course, the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *Coolidge v. New Hampshire,* 403 U.S. at 466, 91 S.Ct. at 2038, 29 L.Ed.2d at 583. (Emphasis added; citation omitted).

In Syllabus Point 3 of *State v. Stone,* 165 W.Va. 266, 268 S.E.2d 50 (1980), we recognized the plain view doctrine:

"It is not a search for the police to discover evidence in plain sight and the warrantless seizure of such evidence is constitutionally permissible provided 1) the police observe the evidence in plain sight without the benefit of a search [without invading one's reasonable expectation of privacy]; 2) the police have a legal right to be where they are when

they make the plain sight observation; and, 3) the police have probable cause to believe that the evidence seen constitutes contraband or fruits, instrumentalities or evidence of crime."

In addressing these elements, "[s]ome courts have restated the first element to be 'the discovery of the evidence must have been inadvertent.' " *State v. Moore,* 165 W.Va. at 852, 272 S.E.2d at 814. (Citations omitted).

"Despite the difference in language, both statements address the same problem, which is that the police may not under the guise of an initial lawful search into a constitutionally protected area, such as a search incident to an arrest, use this action as a means of conducting a broad warrantless search." *State v. Moore,* 165 W.Va. at 852, 272 S.E.2d at 814.

*See State v. Woodson,* 181 W.Va. 325, 382 S.E.2d 519 (1989) (discussed in note 5, *infra,* where we distinguish between the two types of plain view seizures).

Under the standard announced in *Stone* and *Moore,* the seizure of the jacket would not have been proper under the plain view doctrine. The second and third requirements were met in that the police were lawfully on the premises as a result of the arrest warrant and had probable cause to believe the jacket constituted evidence of the crime. However, the first factor in the plain view matrix, that the discovery of the jacket was inadvertent, was lacking. The police were aware that the defendant wore a camouflage jacket at the time of the crime and were hoping to find it in the defendant's trailer.

Recently, however, the United States Supreme Court revisited the plain view doctrine in *Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). In *Horton,* the police had probable cause to believe that the defendant had hidden stolen property and weapons used in a robbery in his house. They filed an affidavit for a search warrant. The search warrant only itemized the property stolen in the robbery and not the weapons used in its commission. While searching the home,

the police observed, in plain view, the weapons and seized them.

■ Initially, the United States Supreme Court explained that the inadvertence requirement of the plain view doctrine was supported only by a plurality of the *Coolidge* Court. The Court in *Horton* then elaborated on the essential predicates of a plain view warrantless seizure. These predicates are (1) that the officer did not violate the Fourth Amendment in arriving at the place from which the incriminating evidence could be plainly viewed; (2) that the item was in plain view and its incriminating character was also immediately apparent; (3) that not only was the officer lawfully located in a place from which the object could be plainly seen, but the officer also had a lawful right of access to the object itself.[4]

With these predicate safeguards in mind, the Supreme Court in *Horton* went on to discuss the "inadvertent discovery" requirement of *Coolidge* and concluded it was unnecessary:

"[E]venhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer. The fact that an officer is interested in an item of evidence and fully expects to find it in the course of a search should not invalidate its seizure if the search is confined in area and duration by the terms of a warrant or a valid exception to the warrant requirement." 496 U.S. at ——, 110 S.Ct. at 2308–09, 110 L.Ed.2d at 124.

Following *Horton,* a number of state courts have concluded that the "inadvertence" requirement is not necessary to sustain a plain view seizure. *See, e.g., People v. Stokes,* 224 Cal.App.3d 715, 273 Cal.Rptr. 752 (1990); *State v. Almand,* 196 Ga.App. 40, 395 S.E.2d 609 (1990); *People v. Gentile,* 205 Ill.App.3d 952, 150 Ill.Dec. 799, 563 N.E.2d 926, *appeal denied,* 137 Ill.2d 667, 156 Ill.Dec. 564, 571 N.E.2d 151 (1990); *State v. Brady,* 569 So.2d 110 (La.App. 1990); *State v. Ainsworth,* 310 Or. 613, 801 P.2d 749 (1990). *See also State ex rel. Love v. One 1967 Chevrolet El Camino,* 247 Kan. 469, 799 P.2d 1043 (1990); *Buie v. State,* 320 Md. 696, 580 A.2d 167 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1011, 112 L.Ed.2d 1094 (1991); *State v. Richardson,* 156 Wis.2d 128, 456 N.W.2d 830 (1990).

■ We agree with *Horton*'s analysis and determine that the inadvertent discovery of the object is not a predicate requirement of a plain view seizure. To the extent that *State v. Stone, supra,* and *State v. Moore, supra,* and their progeny hold to the contrary, they are overruled.[5]

4. The relevant text from *Horton,* 496 U.S. ——, 110 S.Ct. at 2308, 110 L.Ed.2d at 123, including footnote 7, is:

"It is, of course, an essential predicate to any valid warrantless seizure of incriminating evidence that the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed. There are, moreover, two additional conditions that must be satisfied to justify the warrantless seizure. First, not only must the *item be in plain view, its* incriminating character must also be 'immediately apparent.' [*Coolidge v. New Hampshire,* 403 U.S.] at 466, [91 S.Ct. at 2038, 29 L.Ed.2d at 583]; *see also Arizona v. Hicks,* 480 U.S. [321], at 326–327, [94 L.Ed.2d 347 at 354], 107 S.Ct. [1149] at 1153 [ (1987) ]. Thus, in *Coolidge,* the cars were obviously in plain view, but their probative value remained uncertain until after the interiors were swept and examined microscopically. Second, not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself.[7] As the Solicitor General has suggested, Justice Harlan's vote in *Coolidge* may have rested on the fact that the seizure of the cars was accomplished by means of a warrantless trespass on the defendant's property. (Footnote 8 omitted).

"7. 'This is simply a corollary of the familiar principle discussed above, that no amount of probable cause can justify a warrantless search or seizure absent "exigent circumstances." Incontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure....' *Coolidge,* 403 U.S., at 468, [91 S.Ct. at 2039, 29 L.Ed.2d at 585]." (Citations omitted).

5. In *State v. Woodson,* 181 W.Va. 325, 382 S.E.2d 519 (1989), we discussed the two types of

## III.

### THE PRIVILEGE AGAINST SELF–INCRIMINATION

■ The defendant asserts that his Fifth Amendment privilege against self-incrimination was violated when the police seized his clothing. He contends that he was intoxicated at the time he was arrested and was unable to intelligently waive his *Miranda* rights.[6] This argument misunderstands the contours of the protection afforded by the Fifth Amendment.

The Fifth Amendment of the United States Constitution provides, in part: "No person ... shall be compelled in any criminal case to be a witness against himself[.]"[7] Relying on *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), we explained the protection provided by the Fifth Amendment in Syllabus Point 8 of *Marano v. Holland*, 179 W.Va. 156, 366 S.E.2d 117 (1988):

"The Fifth Amendment privilege against self-incrimination has been interpreted to provide protection only where incriminating evidence of a testimonial or communicative nature is sought from a witness through the vehicle of state compulsion."

In *Schmerber v. California, supra,* the defendant argued that the police violated his Fifth Amendment right against self-incrimination when the police took his blood sample over his objections to determine if he was intoxicated. At trial, the defendant moved to suppress the results of the analysis, which proved that the defendant was legally drunk. Despite his objections, the evidence was admitted and the defendant was convicted of driving under the influence of alcohol.

The United States Supreme Court upheld Schmerber's conviction and acknowledged "that in requiring petitioner to submit to the withdrawal and chemical analysis of his blood the State compelled him to submit to an attempt to recover evidence that might be used to prosecute him[.]" 384 U.S. at 761, 86 S.Ct. at 1831, 16 L.Ed.2d at 914. However, "the privilege protects an accused only from being compelled to testify against himself, or otherwise provide the State with evidence of a testimonial or communicative nature[.]" 384 U.S. at 761, 86 S.Ct. at 1830, 16 L.Ed.2d at 914. (Footnote omitted). The Supreme Court concluded:

"Since the blood test evidence, although an incriminating product of compulsion, was neither petitioner's testimony nor evidence relating to some communicative act or writing by the petitioner, it was not inadmissible on privilege grounds." 384 U.S. at 765, 86 S.Ct. at 1833, 16 L.Ed.2d at 916–17.

We reached a similar result in *State v. Grubbs*, 178 W.Va. 811, 364 S.E.2d 824 (1987), where we held that handwriting samples taken from the defendant by the police as evidence that he had forged checks did not violate the defendant's right against self-incrimination. In Syllabus Point 1 of *Grubbs*, we held:

"Handwriting samples or exemplars have long been regarded as physical evidence and are not testimonial. Consequently, they are outside the Fifth Amendment protection against self-incrimination."

*See also State v. Hutchinson,* 176 W.Va. 172, 342 S.E.2d 138 (1986).

Here, the clothing seized was physical evidence and was not of a testimonial or communicative nature. Accordingly, we

---

plain view doctrines. First, we discussed the situation presented in *Coolidge* where the officer is lawfully on the premises by virtue of an arrest warrant or search warrant and he inadvertently comes across evidence of a crime in plain view. The second type of plain view doctrine was described in Syllabus Point 4 of *Woodson:* "Where a police officer is present where he has a lawful right to be and sees in plain view an object that constitutes contraband or evidence of a crime, if this object is also in a public place, it may be seized without a warrant." With the abolition of the inadvertence requirement, the two rules are now merged.

**6.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**7.** Article III, Section 5 of the West Virginia Constitution is similar to the Fifth Amendment and provides: "[N]or shall any person, in any criminal case, be compelled to be a witness against himself[.]"

find the defendant's assignment of error without merit.

## IV.

### SIXTH AMENDMENT RIGHT TO COUNSEL

■ In the alternative, the defendant argues that the seizure of his clothes was unlawful because he had requested a lawyer when he was arrested at his trailer. Such conduct, he argues, violates his Sixth Amendment right to counsel [8] and Article III, Section 14 of the West Virginia Constitution.[9]

A similar argument was advanced in *Schmerber v. California, supra,* and was rejected by the United States Supreme Court. There, the defendant had counsel who advised him not to submit to the blood test. Over his protests, the police obtained a sample of the defendant's blood. The Supreme Court found:

> "Since petitioner was not entitled to assert the privilege, he has no greater right because counsel erroneously advised him that he could assert it. His claim is strictly limited to the failure of the police to respect his wish.... No issue of counsel's ability to assist petitioner in respect of any rights he did possess is presented." 384 U.S. at 766, 86 S.Ct. at 1833, 16 L.Ed.2d at 917.

One year later, the United States Supreme Court further refined when a criminal defendant had a Sixth Amendment right to counsel. *See United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In *Wade,* the defendant was arrested for armed robbery of a bank. Subsequently, the defendant was appointed counsel to represent him. Fifteen days after he was appointed an attorney, the police, without notifying the defendant's attorney, arranged a line-up which included the defendant and five or six other prisoners. Two of the bank employees identified the defendant as the individual who had robbed the bank.

The defendant argued that having a line-up without benefit of counsel violated his Sixth Amendment rights. In response, the government characterized the line-up as a mere preparatory step in the gathering of evidence "not different—for Sixth Amendment purposes—from various other preparatory steps, such as systemized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like." 388 U.S. at 227, 87 S.Ct. at 1932, 18 L.Ed.2d at 1157–58. The United States Supreme Court rejected the government's contention and found:

> "[T]here are differences which preclude such stages being characterized as critical stages at which the accused has the right to the presence of his counsel. Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts. The denial of a right to have his counsel present at such analyses does not therefore violate the Sixth Amendment; they are not critical stages since there is minimal risk that his counsel's absence at such stages might derogate from his right to a fair trial." 388 U.S. at 227–28, 87 S.Ct. at 1932–33, 18 L.Ed.2d at 1158.

In *Gilbert v. California,* 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), the defendant argued that the taking of handwriting exemplars, in the absence of counsel, violated his Sixth Amendment rights. The United States Supreme Court rejected this argument, citing *Wade:*

> "The taking of the exemplars was not a 'critical' stage of the criminal proceedings entitling petitioner to the assistance

---

**8.** The Sixth Amendment of the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence."

**9.** Article III, Section 14 of the West Virginia Constitution provides, in pertinent part: "In all such trials, the accused shall ... have the assistance of counsel[.]"

of counsel. Putting aside the fact that the exemplars were taken before the indictment and appointment of counsel, there is minimal risk that the absence of counsel might derogate from his right to a fair trial." 388 U.S. at 267, 87 S.Ct. at 1953, 18 L.Ed.2d at 1183.

*See also United States v. Terry,* 702 F.2d 299 (2d Cir.1983) (no right to counsel when palm print taken); *United States v. Vickers,* 387 F.2d 703 (4th Cir.1967), *cert. denied,* 392 U.S. 912, 88 S.Ct. 2069, 20 L.Ed.2d 1369 (1968) (seizure of marked money during search did not violate defendant's Sixth Amendment right to counsel); *United States v. Dougall,* 919 F.2d 932 (5th Cir.1990) (seizure of defendant's hair sample did not occur during critical stage); *Agee v. Wyrick,* 414 F.Supp. 435 (W.D.Mo. 1976) (seizure of defendant's shorts for examination after his arrest and before he was appointed counsel was not unconstitutional); *Baylor v. State,* 246 So.2d 516 (Miss.1971) (defendant's Sixth Amendment rights were not violated when his clothes were seized shortly after his arrest and before he was appointed an attorney).

These cases demonstrate that where physical evidence is lawfully seized from the defendant after he has been lawfully arrested, the defendant may not interpose a Sixth Amendment right to counsel to render the seizure invalid.

## V.

### TRANSFERRED INTENT

We find no merit in the defendant's contention that he should not have been charged and convicted of the malicious assault of Joseph Vance. The defendant asserts that because he did not know Joseph Vance was in the building, he could not have the requisite intent to assault him as required under W.Va.Code, 61–2–9(a).[10] Rather, before he can be found guilty of malicious assault, the defendant argues he must intend to injure his intended victim.

The defendant overlooks the "doctrine of transferred intent" which we adopted a number of years ago in *State v. Meadows,* 18 W.Va. 658 (1881). *Meadows* involved a malicious wounding, and we held that where a person intends to kill or injure someone, but in the course of attempting to commit the crime accidentally injures or kills a third party, the defendant's criminal intent will be transferred to the third party. Under this doctrine, a defendant cannot escape guilt because he accidentally injured or killed an innocent bystander while attempting to kill or injure the intended victim. Syllabus Point 8, *State v. Meadows, supra.*[11] *See State v. Daniel,* 182 W.Va. 643, 391 S.E.2d 90 (1990); *State v. Hall,* 174 W.Va. 599, 328 S.E.2d 206 (1985); *State v. Currey,* 133 W.Va. 676, 57 S.E.2d 718 (1950). *Cf. State v. Young,* 173 W.Va. 1, 311 S.E.2d 118 (1983) (felony-murder doctrine provides that felonious intent involved by underlying felony may be transferred to supply intent to kill necessary to characterize the homicide as murder).

Other jurisdictions also recognize this principle. *E.g., In the Matter of E.D.P.,* 573 A.2d 1307 (D.C.App.1990); *People v. Migliore,* 170 Ill.App.3d 581, 121 Ill.Dec. 376, 525 N.E.2d 182, *appeal denied,* 122 Ill.2d 587, 125 Ill.Dec. 229, 530 N.E.2d 257 (1988); *Holt v. State,* 266 Ind. 586, 365 N.E.2d 1209 (1977); *Gladden v. State,* 273 Md. 383, 330 A.2d 176 (1974); *State v. Cole,* 121 R.I. 39, 394 A.2d 1344 (1978); *Riddick v. Commonwealth,* 226 Va. 244, 308 S.E.2d 117 (1983). As with criminal homicide and battery, "arson and malicious mischief do not require that the defendant cause harm

---

**10.** Our malicious assault statute, W.Va.Code, 61–2–9(a), states, in pertinent part:

"If any person maliciously shoot, stab, cut or wound any person, or by any means cause him bodily injury with *intent to maim, disfigure, disable or kill,* he shall, except where it is otherwise provided, be guilty of a felony, and, upon conviction, shall be punished by confinement in the penitentiary not less than two nor more than ten years." (Emphasis added).

**11.** Syllabus Point 8 of *Meadows* states:

"If A is indicted for shooting C with intent to maim, disfigure, disable and kill him, and the proof is, that he shot at B and missed him and accidentally hit C, he can be convicted on such indictment for shooting C with intent to maim, disfigure, disable and kill him."

to the intended victim; an unintended victim will do just as well." W. LaFave & A. Scott, *Criminal Law* 253 (3d ed. 1977). *See also Evans v. State*, 28 Md.App. 640, 349 A.2d 300 (1975), *aff'd*, 278 Md. 197, 362 A.2d 629 (1976).

Even though the defendant did not intend to hurt Joseph Vance, under the doctrine of transferred intent, he may be charged and convicted of malicious assault.

## VI.
## EVIDENCE OF THE EXTENT OF THE INJURY UNDER W.VA.CODE, 61-2-9

■ The defendant argues that the trial court erred when it permitted the witness, Joseph Vance, to show his scars to the jury because their prejudicial effect substantially outweighed their probative value. He contends that like gruesome photographs, the purpose of this type of evidence is to elicit sympathy for the victim from the jury. This argument fails to recognize numerous cases in this jurisdiction holding otherwise. *See, e.g., State v. Scotchel*, 168 W.Va. 545, 285 S.E.2d 384 (1981); *State v. Sacco*, 165 W.Va. 91, 267 S.E.2d 193 (1980); *State v. Stalnaker*, 138 W.Va. 30, 76 S.E.2d 906 (1953); *McComas v. Warth*, 113 W.Va. 163, 167 S.E. 96 (1932); *State v. Taylor*, 105 W.Va. 298, 142 S.E. 254 (1928). As we held in Syllabus Point 5 of *State v. Scotchel, supra:*

> "Under our malicious wounding statute, W.Va.Code, 61-2-9, evidence of the extent of an injury is admissible since under the statute the State must show that the defendant inflicted the injury with an intent to produce a permanent disability or disfiguration."

We also find the defendant's analogy to gruesome photographs irrelevant:

> "A scar is not necessarily gruesome in appearance. A scar represents the present and actual condition which is relevant to the issue of intent to cause permanent disability or disfigurement, while a gruesome photograph depicts the initial and temporary extent of the wound. In the latter, the shock effect often outweighs the probative value of

the evidence." *State v. Scotchel*, 168 W.Va. at 555, 285 S.E.2d at 390.

## VII.
## INEFFECTIVE ASSISTANCE OF COUNSEL

The defendant sets forth a variety of ways his counsel was deficient during trial, the cumulative effect of which deprived him of the level of legal assistance guaranteed by the Sixth Amendment to the United States Constitution, and Article III, Section 14 of the West Virginia Constitution. For example, the defendant claims that his counsel was ineffective in failing to make a motion to request separate trials on each individual count; in failing to employ an expert to dispute the conclusions of the State police chemist; in failing to conduct effective voir dire; and because he was inexperienced in handling felony criminal cases.

■ In *State v. England*, 180 W.Va. 342, 353, 376 S.E.2d 548, 559 (1988), we "expressed concern that claims of ineffective assistance of counsel may be inadequately developed on appeal and, therefore, inappropriate subjects for direct review." After recognizing this dilemma, we held in Syllabus Point 11 of *England:*

> "Where the record on appeal is inadequate to resolve the merits of a claim of ineffective assistance of counsel, we will decline to reach the claim so as to permit the defendant to develop an adequate record in habeas corpus."

■ We find the record inadequate to resolve the defendant's ineffective assistance claims. Accordingly, we decline to find that defense counsel was ineffective. However, if the defendant wishes, he may proceed with his claim of ineffectiveness in a habeas corpus proceeding.

## VIII.
## DOUBLE JEOPARDY

■ Finally, the defendant asserts that because his first degree murder conviction was premised on the felony-murder rule, the trial court violated the double jeopardy

provisions of both the federal [12] and our state constitution [13] when it convicted and sentenced him for the underlying offense of arson. The State confesses error on this point. This Court is not obligated to accept the State's confession of error in a criminal case. We will do so when, after a proper analysis, we believe error occurred. [14] *See, e.g., State v. Tesack,* 181 W.Va. 422, 383 S.E.2d 54 (1989); *Turner v. Holland,* 175 W.Va. 202, 332 S.E.2d 164 (1985); *State v. Young,* 166 W.Va. 309, 273 S.E.2d 592 (1980); *Gibson v. Bechtold,* 161 W.Va. 623, 245 S.E.2d 258 (1978).

■■■■■ The Double Jeopardy Clauses of both the federal and state constitutions protect an accused in a criminal proceeding from "multiple punishments for the same offense." Syllabus Point 1, in part, *Conner v. Griffith,* 160 W.Va. 680, 238 S.E.2d 529 (1977). In determining what constitutes the "same offense" for double jeopardy purposes, courts apply the "same evidence" test. This rule of law was first announced by the United States Supreme Court in *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306, 309 (1932):

"The applicable rule is that where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not."

*E.g., State v. Pancake,* 170 W.Va. 690, 296 S.E.2d 37 (1982).

The argument advanced by the defendant is not novel. A similar argument was made in *State v. Williams,* 172 W.Va. 295, 305 S.E.2d 251 (1983), and we held that the double jeopardy prohibition had been violated. We relied on the case of *Harris v. Oklahoma,* 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977), where the United States Supreme Court concluded that a felony-murder conviction based on an underlying robbery precluded a separate conviction on the robbery under the Double Jeopardy Clause.

■■■ The crime of felony-murder is a distinct category of first degree murder and is statutorily defined as "[m]urder ... in the commission of, or attempt to commit, arson, sexual assault, robbery, or burglary, is murder of the first degree." W.Va. Code, 61–2–1 (1987). [15] Unlike other first degree murders, a conviction for felony-murder does not require proof of the elements of malice, premeditation, or specific intent to kill. Syllabus Point 7, *State v. Sims,* 162 W.Va. 212, 248 S.E.2d 834 (1978). *See also State v. Mayle,* 178 W.Va. 26, 357 S.E.2d 219 (1987); *State ex rel. Levitt v. Bordenkircher,* 176 W.Va. 162, 342 S.E.2d 127 (1986). We stated the proof required for felony-murder in *State v. Williams,* 172 W.Va. at 311, 305 S.E.2d at 267:

"Rather, the elements which the State is required to prove to obtain a conviction of felony murder are: (1) the commission of, or attempt to commit, one or more of the enumerated felonies; (2) the defen-

---

**12.** Amendment V of the United States Constitution provides, in part: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb[.]"

**13.** Article III, Section 5 of the West Virginia Constitution is virtually identical to the Fifth Amendment.

**14.** This rule has been expressed in a somewhat more cumbersome fashion and overlooks that sometimes, as here, the State's confession of error will not result in a complete reversal of the case. Syllabus Point 1 of *State v. Young,* 166 W.Va. 309, 273 S.E.2d 592 (1980), illustrates:

" ' "In a criminal case where the State confesses error, urges that the judgment be reversed and that the defendant be granted a new trial, this Court, upon ascertaining that

the errors confessed are reversible errors and do in fact constitute cause for the reversal of the judgment of conviction, will reverse the judgment and grant the defendant a new trial." Syl. *State v. Goff,* [159 W.Va. 348], 221 S.E.2d 891 (1976)'; *State v. Cokeley,* [159 W.Va. 664], 226 S.E.2d 40 (1976)."

**15.** The felony-murder rule has recently been broadened. W.Va.Code, 61–2–1 (1991), now reads, in relevant part:

"Murder ... in the commission of, or attempt to commit, arson, kidnapping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four, chapter sixty-a [§ 60A–4–401 et seq.] of this code, is murder of the first degree."

dant's participation in such commission or attempt; and (3) the death of the victim as a result of injuries received during the course of such commission or attempt." (Citation omitted).

To obtain a conviction for felony-murder, both the underlying felony and the homicide must be proved. Because the proof of the underlying felony is a key ingredient of proof of the felony-murder, double jeopardy precludes a separate conviction and punishment for the underlying felony. Accordingly, we held in Syllabus Point 8 of *Williams:*

"Double jeopardy prohibits an accused charged with felony-murder, as defined by W.Va.Code § 61–2–1 (1977 Replacement Vol.), from being separately tried or punished for both murder and the underlying enumerated felony." [16]

We have reviewed the record and find that there were no errors committed at trial warranting a reversal of the defendant's felony-murder conviction. We do find that the defendant's arson conviction was unconstitutional and that he was improperly separately sentenced on this offense. In this situation, the appropriate relief is to reverse the arson conviction and remand the case for resentencing. *See State v. Williams, supra; State v. Fairchild,* 171 W.Va. 137, 298 S.E.2d 110 (1982); *State ex rel. Nicholson v. Boles,* 148 W.Va. 229, 134 S.E.2d 576 (1964). *See also State*

*ex rel. Mounts v. Boles,* 147 W.Va. 152, 126 S.E.2d 393, *cert. denied,* 371 U.S. 930, 83 S.Ct. 298, 9 L.Ed.2d 235 (1962).[17]

Accordingly, we affirm the defendant's felony-murder, attempted murder, and malicious assault convictions, but reverse the conviction for arson. We remand the case for resentencing.[18]

Affirmed, in part,

Reversed in part,

and Remanded.

---

**16.** In *State ex rel. Hall v. Strickler,* 168 W.Va. 496, 285 S.E.2d 143 (1981), we addressed whether an individual could be tried for felony-murder and then later tried for the underlying offense of robbery. In the Syllabus of *Hall,* we held: "Federal and State constitutional double jeopardy principles are violated by serial trials for a greater offense of felony-murder and its lesser-included offense of robbery. U.S. Const. amend. XIV and W.Va. Const. art. III, § 5."

**17.** Once again, we are asked to find the felony-murder rule unconstitutional because it does not require proof of "malice, premeditation, or specific intent to kill." Syllabus Point 7, in part, *State v. Sims, supra.* We continue to adhere to our established rule that the felony-murder rule is constitutional. *See State v. Cook,* 175 W.Va. 185, 332 S.E.2d 147 (1985); *State v. Taylor,* 168 W.Va. 380, 285 S.E.2d 635 (1981).

**18.** The defendant asserts that the trial court erred in giving several instructions offered by

the State. Because trial counsel failed to object to any of the State's instructions, we find that he waived this alleged error on appeal. W.Va. R.Crim.P. 30.

Finally, the defendant argues alleged error during the voir dire of the jury. In Syllabus Point 3 of *State v. Beck,* 167 W.Va. 830, 286 S.E.2d 234 (1981), we held:

"'The true test as to whether a juror is qualified to serve on the panel is whether without bias or prejudice he can render a verdict solely on the evidence under the instructions of the court.' Syllabus Point 1, *State v. Kilpatrick,* [158 W.Va. 289], 210 S.E.2d 480 (1974)."

The trial court conducted an individual voir dire of every juror who indicated reasons for potential bias against the defendant. We cannot conclude from the record that these jurors were unable to render a verdict solely on the evidence adduced at trial.