No. 11-0915 - State of West Virginia v. Gary Richard Baker

**FILED**

**February 21, 2013**
released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

LOUGHRY, Justice, dissenting:

I dissent from the majority's decision in this case for two reasons. First, I believe the evidence regarding the petitioner's incarceration and parole status was properly admitted into evidence by the trial court for the limited purpose of explaining the passage of time. Secondly, assuming *arguendo* that the evidence was improperly admitted, I believe it was harmless error. As set forth below, there was sufficient evidence from which the jury could have reached a verdict of guilt beyond a reasonable doubt absent the arguably inadmissible evidence.

A. The Petitioner Opened the Door

I strongly disagree with the majority's conclusion that the petitioner did not open the door through his cross-examination of Mr. Smith for the admission of evidence regarding his prior incarceration and parole status. The majority reached its decision by focusing on a narrow passage of the cross-examination and turning a blind eye to the rest of

1

the testimony elicited by the petitioner from Mr. Smith.[1]  The petitioner questioned Mr.

Smith as follows:

Q      Mr. Smith, I'm not going to keep you very long. [The
       petitioner] wasn't the first employee that you had to let
       go, was he?

A      Oh, no, sir.

Q.     You must have dealt with a lot of them.

A.     Quite a bit.

Q.     Probably wasn't one of the first ones agitated about it,
       either?

A.     I would assume not so.

Q.     When did you sell the Fairlea Subway?

A.     January of 2000.

Q.     So you haven't owned it for nine years?

A.     That's correct.

. . . .

Q.     And summer of '99, is when the confrontation between
       you and [the petitioner] took place?

A.     That's when the incident occurred, yes.

---

[1]Obviously, I believe that the State should not have confessed error in this case. Regardless, as even the majority acknowledges, this Court will not allow a confession of error to dictate the outcome of a case.  Syl. Pt. 8, *State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991).

Q.	10 years ago, this past summer?

A.	That's correct.

Q.	And this was a part time job?

A.	Yes, it was.

Q.	With no benefits?

A.	No benefits.

Q.	Minimum wage, I'm sure?

A.	That's correct, to start.

Q.	And he was only there for a week?

A.	Week to 10 days.

Q.	So it's not like he lost his pipeline to the gold mine, right?

A.	I don't know what his opinion was.

Q.	Again, you're paying minimum wage, hiring part time without benefits, correct?

A.	That's correct.


The State's theory at trial was that the petitioner robbed the Subway for revenge against Mr. Smith because he had been fired. When the petitioner's cross examination of Mr. Smith is considered in its entirety, it is obvious that an impartial juror could not help but wonder why a person that only worked at this Subway for a week making

3

minimum wage with no benefits would wait ten years to exact his revenge for being fired. It is clear that through the cross-examination of Mr. Smith, the petitioner successfully called into question the State's revenge motive. Because of the court's pre-trial ruling that evidence regarding the petitioner's incarceration for the past ten years and status as a parolee was not admissible, the State was left unable to explain the ten-year lapse of time. Like the trial court, I believe that at this point in the proceedings, the evidence of the petitioner's incarceration and parole became more probative than prejudicial and became admissible to explain the time gap pursuant to the doctrine of opening the door.

Just as a defendant has a right to a fair trial, so does the State. The defense has to comply with the established rules of procedure and evidence in the same manner as the prosecution. That was not done here. This was a classic case of opening the door. The petitioner successfully excluded inadmissible evidence from the prosecution's case and then elicited other evidence to his own advantage which the State could not put in proper context. In such instance, "the doctrine of opening the door allows a party to explore [the] otherwise inadmissible evidence . . . [because] the opposing party has made unfair prejudicial use of related evidence." *United States v. Lum*, 466 F.Supp. 328, 334 (D. Del. 1979). Here, it would have been grossly unfair to allow the jury to believe that nothing occurred in the past ten years that would have prevented the petitioner from exacting his revenge sooner.

I also think it is important to note that the trial court limited the information given to the jury concerning the petitioner's prior ten-year incarceration and parole status. In that regard, the jury was not informed of the nature of the crimes that resulted in the petitioner's incarceration. Moreover, the trial court gave four limiting instructions, cautioning the jury that the information was to be used for the limited purpose of explaining the passage of time.[2] The trial court clearly took the necessary steps to ensure the jury

_____

[2]The trial court gave the following limiting instruction to the jury before the petitioner's parole officer testified:

> Before the State begins to examine this witness, I am required to give you what is called a limiting instruction.
>
> There will be some evidence admitted during Ms. Fitzgerald's testimony that you may consider only for a limited purpose. So I'm going to read that instruction now.
>
> The Court instructs the members of the jury that evidence of collateral acts of misconduct is not to be considered in establishing guilt of the crime with which the defendant is charged, and you may consider that evidence for a very limited purpose, only. You may not consider it as proof of the charges contained in the indictment. You may consider it to show the passage of time.
>
> You may not use this evidence in consideration of whether the State has established the crime charged in the indictment. In addition, such evidence is not relevant to any other matters, such as the character of the defendant, whether the defendant is a bad person, or whether the defendant had the propensity or the disposition to commit the crime charged. This evidence may not be considered in that regard, since the defendant's character is not an issue.

5

understood the limited purpose for which the evidence of the petitioner's prior incarceration and parole was being offered. Therefore, unlike the majority, I find no error in the trial court's admission of this evidence pursuant to the doctrine of opening the door.

## B. Clearly Harmless Error

Assuming *arguendo* that the evidence of petitioner's incarceration and parole status should have been excluded, I believe that the admission of that evidence was harmless error in this case. Contrary to the "grave doubts" expressed by the majority, I believe that

---

In addition, it is not proper for the State to prove a criminal case by evidence that a defendant may have committed other criminal acts or may be a bad person.

Now you will also receive a copy of this instruction when you begin your deliberations.

A similar instruction was given before the testimony of First Sergeant Jan Cayhill of the West Virginia State Police. Following Sergeant Cayhill's testimony, the trial court gave the following instruction for clarification:

Before the defendant's cross-examination of Sgt. Cayhill, I want to clarify the limiting instruction. I gave that to you, and then we've had two witnesses testify, and you're probably thinking, well, what exactly is he talking about. And what I'm talking about is that you can only use the fact that the defendant is a convicted felon and was placed on parole and his time that he was incarcerated for the purpose of – for the limited purpose of the passage of time. I hope that makes it clear to you all.

The limiting instruction was given again before the jury began their deliberations.

6

the State's evidence presented at trial was sufficient to convince the jury of the petitioner's guilt beyond a reasonable doubt even if the evidence of the petitioner's prior incarceration and parole status had been excluded.

The majority suggests that the only plausible evidence the State had to point to the petitioner's guilt was (1) the victim's identification of the pellet pistol found in the petitioner's car as a weapon that looked like the weapon used by the robber and (2) the cellular phone records that placed the petitioner in Greenbrier County shortly after the robbery occurred. That is not the case. Again, the majority turned a blind eye to the entirety of the evidence presented. I will outline the evidence that the State offered at trial. When considered in its entirety, I believe it is clear that there was sufficient evidence to support the jury's verdict.

To begin, the petitioner was not just placed in Greenbrier County shortly after the robbery occurred by his cellular phone records. The petitioner was actually placed in Greenbrier County *before* the robbery occurred–he so stipulated at trial. Furthermore, a relative of the petitioner, Lisa Arbogast,[3] and her ex-husband, John Arbogast, testified that the petitioner arrived at their home in Greenbrier County between 6:30 and 7:30 p.m. on the

_____

[3]Lisa Arbogast is a distant cousin of the petitioner. She testified that she has known the petitioner since they were children.

7

evening of the robbery.[4]    Both Lisa and John Arbogast testified that during the course of his visit, the petitioner constantly watched the clock and "seemed nervous."

The jury learned that the petitioner left the Arbogast home around 10:30 p.m., and the Subway was robbed around 11:30 p.m.  Shortly before, around 10:55 p.m., Kristen Smith,[5] who was driving past the Subway on her way to work, testified that she saw a bluish teal sports car with "hood scoops" parked about one hundred yards from the Subway.  She noticed the car because it was located in an area where cars do not normally park.   She observed a man with a "heavy build" standing outside of the car who appeared to be changing his clothes.  The State showed Kristen Smith photographs of the petitioner's car–*a1994 Pontiac Firebird, bluish-teal in color*–at trial.  She testified that it looked like the car that she saw parked near the Subway on the night of the robbery.

During the ensuing investigation, a canine unit indicated that the robber left the Subway and went in the direction of where the car observed by Kristen Smith had been parked.  Surveillance video from inside and outside the Subway contained images of the masked robber. The video showed a person of short, stocky build.  As the investigation progressed and the petitioner became a suspect, Lisa Arbogast was asked to the view the

---

[4]Lisa and John Arbogast are divorced but still lived together at the time of the robbery.

[5]Kristin Smith and the victim, Whitney Smith, are not related.

video of the robbery. She testified at trial that the robber in the video could have been the petitioner based on "the shoes and maybe some gestures . . . body build and the way that he walked and the shoes."

First Sergeant Jan Cayhill of the West Virginia State Police testified that based on the video, the police believed that the robber did not have a real gun because of the way the robber handled the gun and its appearance. The victim, Whitney Smith, testified that the weapon used by the robber sounded like an air gun. She explained that she was familiar with air guns because she owned one. When presented with the pellet gun found in the petitioner's possession after the robbery occurred, Whitney Smith testified that it was the same gun used by the robber. Importantly, Whitney Smith also testified that the robber seemed familiar with the layout of the Subway and appeared to know where the safe was located.

The petitioner became a suspect after he was observed sitting in his car along the interstate in Greenbrier County in the early morning hours of the day following the robbery. Deputy Rick Honaker of the Greenbrier County Sheriff's Department testified that he stopped and talked to the petitioner because he thought he was having car trouble. Deputy Honaker later relayed the incident to the officer investigating the robbery because the petitioner matched the description of the robber given by the victim, Whitney Smith.

The petitioner's mother, who lived in Greenbrier County, was interviewed by the police. As a parolee, the petitioner's travel was limited. The petitioner was residing in Huntington and had obtained permission from his parole officer to go to Greenbrier County on the day of the robbery. He had visited his mother around 4:00 p.m. that day. The petitioner's mother told the police that she had received a call from her son around midnight, approximately thirty minutes after the robbery occurred. The petitioner told his mother that he was driving back home and that he was between Charleston and Huntington, more than two hours from Greenbrier County. The State proved at trial, however, that the petitioner had lied to his mother. The petitioner's cellular phone records placed him in Greenbrier County–in Fairlea, where the Subway is located– at the time the call was made to his mother. Furthermore, the petitioner's cell phone records showed that he received three calls during the time the robbery occurred that were not answered but, instead, went to voice mail. These calls also placed the petitioner in Fairlea.

The petitioner told the same lie regarding his location at the time of the robbery to the police during their investigation. Sergeant Cayhill testified at trial that the petitioner was shocked and surprised when he was informed that a person's location could be determined by the particular cell phone tower that was accessed when a cellular phone call was placed.

The petitioner also lied to his parole officer. When she asked him what time he left Greenbrier County on the night of the robbery, he told her that he had fallen asleep at his mother's house and that he had left Greenbrier County between 9:00 and 10:00 p.m.

Sergeant Cayhill further testified at trial that in executing a search warrant of the petitioner's home in Cabell County, a police scanner was found in the petitioner's possession. The petitioner's mother testified that the petitioner had the scanner with him when he visited her house on the day of the robbery. Although the petitioner's mother did not see him with the pellet gun, the petitioner told his parole officer that he got the pellet gun from his mother's house that same day.

Sergeant Cayhill explained to the jury that a police scanner allows a person to listen to police traffic, fire, and EMS calls, if you have the proper frequency for the agency and county. The petitioner told Sergeant Cayhill that he liked to listen to the scanner and that he used headphones and attached the scanner to his belt so that his hands were free. When the police examined the scanner the petitioner had in his possession, they discovered that it was tuned to the Greenbrier County emergency frequencies. Sergeant Cayhill also told the jury that the robber was in the Subway for nineteen minutes, which based on his lengthy experience as a police officer was a long time for a robbery. He said that most robberies are completed within a few minutes. Obviously, if the robber had a scanner tuned to the local

11

police frequency, he would not have to worry too much about being caught as he would know when the police were on the way.

In summary, the jury heard testimony that there was an attempted robbery at the Subway located in Fairlea in Greenbrier County by a masked man who was familiar with the layout of the restaurant. Although the robbery of the Subway was unsuccessful, the robber was able to take $100 from Whitney Smith. The petitioner had been previously fired from his employment at this Subway. No changes, other than decor, had been made to the restaurant since the petitioner worked there. Although the petitioner lived in Huntington, he was in Greenbrier County on the day of the robbery and during the early morning hours thereafter. According to the victim, the robber used a pellet gun during the commission of the robbery. A pellet gun was found in the possession of the petitioner after the robbery occurred which the victim identified as the same gun used during the robbery. The petitioner appeared nervous and constantly watched the clock during a visit with relatives shortly before the robbery occurred. A car that looked like the vehicle driven by the petitioner was parked near the Subway just before the robbery occurred, and a stocky man, like the petitioner, was standing beside the car and appeared to be changing his clothes. The surveillance video of the robbery showed a masked man who had the same mannerisms and build as the petitioner according to his relatives. The petitioner was found in possession of a police scanner tuned to the Greenbrier County emergency frequencies after the robbery

12

occurred. The petitioner lied to his mother, his parole officer, and the police about his location when the robbery occurred, attempting to create an alibi and that was proven to be false. The petitioner's cellular phone records showed that he was in the vicinity of the Subway at the time of the robbery and not on his way back to Huntington as he claimed.

Given all of these facts that were proven at trial, I believe that there was clearly sufficient evidence to support the jury's verdict of guilt beyond a reasonable doubt. This Court has explained that "when dealing with the wrongful admission of evidence . . . the appropriate test for harmlessness . . . is whether we can say with fair assurance, after stripping the erroneous evidence from the whole, that the remaining evidence was independently sufficient to support the verdict and the jury was not substantially swayed by the error." *State v. Guthrie*, 194 W.Va. 657, 684, 461 S.E.2d 163, 190 (1995). I do not believe that jury was swayed by the petitioner's prior conviction and parole status. Instead, I believe that the jury was swayed by the other overwhelming evidence that pointed to the petitioner's guilt and that the admission of the evidence regarding his incarceration and parole status was, at worst, harmless error.

Accordingly, for the reasons set forth above, I would have affirmed the petitioner's convictions. Therefore, I respectfully dissent from the majority's decision in this case.

13