466 S.E.2d 402

**STATE of West Virginia, Appellee,**

v.

**Earnest SUTPHIN, Appellant.**

**No. 22833.**

Supreme Court of Appeals of West Virginia.

Submitted Sept. 27, 1995.

Decided Dec. 7, 1995.

552

554

Richard M. Riffe, Assistant Prosecuting Attorney, Madison, for Appellee.

Henry E. Wood, III, Charleston, for Appellant.

RECHT, Justice:

The defendant, Earnest Sutphin, appeals from a final order of the Circuit Court of Boone County, entered the 4th day of March, 1994, sentencing him upon his conviction of murder of the second degree to confinement in the West Virginia Penitentiary for a period of not less than five nor more than eighteen years.[1]

On appeal, the defendant asserts that the trial court erred by (1) denying his motion for a new trial and failing to set aside a verdict which was a product of a jury that was not fair and impartial; and (2) permitting the State to introduce evidence of a statement made to the victim by the defendant, repeated by the victim to her father, and offered through the victim's father, better known as "hearsay within hearsay." After reviewing these contended errors, we do not find that they warrant reversal of the defendant's conviction.

I.

FACTUAL BACKGROUND OF CRIME

The defendant and the victim, Unita Lynn Lusk, began living together in September of 1990, approximately one year before the victim's death. This relationship was stormy and marked by episodes of violence, prompt-

---

1. Mr. Sutphin's conviction occurred prior to the effective date of the amendment to W.Va.Code 61–2–3 (1994) (passed March 12, 1994, effective ninety days from passage), which increased the penalty for murder of the second degree to a definite term of imprisonment in the West Virginia Penitentiary of not less than ten nor more than forty years.

ing the victim from time to time to leave and then resume the relationship.

Sometime during the summer of 1991, the victim left the defendant and sought refuge for the night at her grandmother's house in Madison, West Virginia. The next day, the victim telephoned her father, Roy Lusk, and asked him to pick her up at her grandmother's house. Mr. Lusk drove to his mother's (the victim's grandmother) home to pick up his daughter, and as Mr. Lusk and the victim were leaving the home, the victim observed the defendant in front of the house sitting in his automobile. The defendant wanted to speak to the victim. Mr. Lusk and the victim initially ignored the defendant and proceeded to walk down the street toward Mr. Lusk's automobile, which was parked approximately two blocks from the grandmother's house.

After walking about one block, Mr. Lusk and the victim were once again confronted by the defendant, who had driven his automobile from the grandmother's house toward Mr. Lusk and the victim. The defendant again asked to speak to the victim. This time the victim chose to enter the defendant's automobile, while Mr. Lusk remained approximately ten feet away. Mr. Lusk could see into the defendant's automobile but could not hear any of the conversation; however, he did observe the defendant lean toward the victim, and the victim crying as a result.

After talking for approximately thirty minutes, the victim exited the automobile and proceeded to walk with her father back toward the grandmother's house. They walked approximately one-half block from where the conversation between the victim and the defendant took place when the victim, who was still visibly scared, nervous, and shaking, related to her father that the defendant had told her he would kill her if she ever left him again. Mr. Lusk accompanied the victim back to the grandmother's house where she gathered her belongings and returned to live with the defendant.

Approximately three months after this conversation between the defendant and the victim, a series of events occurred which ultimately left the victim dead and the defendant charged with the crime of murder.

On November 9, 1991, while at the defendant's mobile home, the victim made several telephone calls to a friend, Billy Dale Nelson. The victim first telephoned Mr. Nelson at 3:00 p.m., stating that she and the defendant had been fighting. Mr. Nelson offered to pick up the victim, but she refused, expressing concern that the defendant would be upset. Approximately an hour later, the victim again called Mr. Nelson and requested that he go to her father's house and tell her father that she and the defendant had been fighting and to come to pick her up because she needed to get away. Mr. Nelson's mother went to the home of the victim's father to relay this information to him.

At approximately 5:00 p.m., the victim again called Mr. Nelson and asked if her father had been told to pick her up, as she had packed her clothes and could not wait any longer. The victim's sisters were then sent to the mobile home to assist the victim in leaving. At approximately 6:45 p.m., while traveling toward the mobile home, the sisters stopped to telephone the victim to confirm that she really wanted to leave. During this conversation the victim, who was crying, reiterated her desire to leave, at which point the telephone went silent.

The victim's sisters arrived at the mobile home approximately five to ten minutes after this last telephone conversation and found the victim shot in the neck and the defendant covered with blood while talking on the telephone with the paramedics. The victim died by the time the paramedics arrived.

## II.

### JUROR MISCONDUCT AS PREJUDICIAL

#### A.

*Factual Background*

We first address whether an uninvited visit by a juror to the home of a witness during the course of the trial constitutes prejudicial conduct sufficient to warrant granting the defendant a new trial.

The trial commenced on Monday, November 15, 1993, with the parties selecting and the court impaneling a jury. Testimony began on Tuesday, November 16, 1993. On Thursday, November 18, 1993, the State called as its witness the defendant's cousin, James Dickens. Mr. Dickens testified that shortly after the victim's death, his wife, Patricia Dickens, discovered a bullet shell at the defendant's mobile home.[2] After Mr. Dickens was excused, two jurors, Robert Jarrell and Rodney Lowery, informed the trial judge that they had both known Mr. Dickens for a number of years. Mr. Dickens's name was not on the witness list that was read to the jurors during voir dire. Despite this revelation, neither Mr. Jarrell nor Mr. Lowery was excused as jurors.

On Thursday evening, after Mr. Dickens completed his testimony, Mr. Jarrell, despite the court's repeated admonition not to discuss the case with anyone, made an uninvited visit to the Dickens residence. Apparently, the purpose of the visit was to inform Mr. Dickens that Mr. Jarrell did not know Mr. Dickens would be called as a witness, and also to assure himself that serving on the jury would not affect their friendship. The visit, which lasted approximately two to three hours, occurred prior to the trial court's charge to the jury, closing arguments and jury deliberation.

At 10:45 p.m. on Friday, November 19, 1993, after the jury returned a guilty verdict, Mr. Dickens informed defense counsel of his conversation with Mr. Jarrell, who in turn advised the court of the incident.

The trial court, upon learning of the contact by the juror with a witness, conducted hearings on December 6, 1993, and January 25, 1994, during which both jurors Jarrell and Lowery, as well as James Dickens and his wife Patricia Dickens, testified.

The purpose of the hearing was to assist the trial court in determining whether the contact initiated by juror Jarrell with witness Dickens resulted in prejudice to the defendant so as to justify the granting of a new trial.[3]

The witnesses who recounted what occurred during the Thursday evening meeting at the Dickens residence: (1) did not testify that any opinions were expressed as to the guilt or innocence of the defendant; (2) did not testify that any portion of Mr. Dickens's testimony was discussed; and (3) did not testify that juror Jarrell had stated that he had reached a decision as to the guilt or innocence of the defendant.

The witnesses who recounted what occurred during the Thursday evening meeting: (1) did testify that they discussed the testimony of Sergeant Smith with particular emphasis on the size of his hand;[4] and (2) did testify that 95 percent of the conversation concentrated on the past relationship between juror Jarrell and witness Dickens, including their former sporting exploits.[5]

Also during the hearing, Mr. Jarrell testified that nothing that was discussed during the Thursday evening meeting influenced his decision in any fashion.

The hearing also produced the testimony of Rodney Lowery, who was the other juror

2. Patricia Dickens, although a potential witness, was never called by the State.

3. Upon learning of the juror's contact with the witness, the defendant's lawyer promptly obtained an affidavit which chronicled the visit, and thereafter made the affidavit the basis of a motion for a new trial.

4. Sergeant Smith was offered by the State as an expert in firearms and tool marks. During cross-examination, efforts were made to demonstrate that the size of Sergeant Smith's hand would affect his ability to remove the cartridge from the gun. We cannot speculate as to the significance of this testimony; however, there is nothing in the record to suggest that this discussion manifested any indication that Mr. Jarrell's decision was influenced by the discussion or that he had prematurely determined the defendant's guilt without the benefit of the court's charge and the closing arguments.

5. Mrs. Dickens speculated during the hearing that juror Jarrell must have prematurely determined the defendant's guilt since there was no reason for him to attempt to solidify his friendship with witness Dickens if it were not in an attempt to obtain absolution for assisting in finding the defendant, who was a cousin of witness Dickens, guilty. While this syllogism is interesting, it does not constitute the type of competent evidence sufficient to warrant a reversal of the guilty verdict.

who knew witness Dickens and who, along with juror Jarrell, informed the trial judge as to his acquaintance with witness Dickens. Mr. Lowery testified that Mr. Jarrell approached him the morning after the Thursday evening visit to inform him of his conversation with Mr. Dickens. After learning from Mr. Jarrell that the case was not discussed, Mr. Lowery terminated the conversation, feeling that anything Mr. Jarrell and Mr. Dickens discussed was immaterial to the case. Mr. Lowery testified that his decision was not influenced by the fact that Mr. Jarrell had spoken with Mr. Dickens.

At the conclusion of the hearings, the trial judge found that while there had been improper contact between Mr. Jarrell and Mr. Dickens, there was no clear and convincing evidence that the contact affected the jury's deliberations or prejudiced the defendant.

### B.

*Juror Conduct Prejudicial to Defendant?*

█ We do not take lightly our responsibility in reviewing a verdict that is returned by a jury, one of whose members may have either prematurely reached a decision based on information not presented during the trial, or introduced into the jury room extrinsic information upon which other jurors may have based their decision. Any challenge to the lack of the impartiality of a jury assaults the very heart of due process. *Irvin v. Dowd,* 366 U.S. 717, 721–722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751, 755 (1961). "The inevitable result of misconduct on the part of a juror is to cast suspicion on the impartiality of the verdict rendered by a jury of which he is a member." *Legg v. Jones,* 126 W.Va. 757, 763, 30 S.E.2d 76, 79 (1944).

This unusual factual backdrop, then, requires our analysis as to whether the misconduct of juror Jarrell has prejudiced the defendant to the extent that he did not receive a fair trial. *See United States v. Klee,* 494 F.2d 394 (9th Cir.), *cert. denied,* 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974).

We begin our analysis, as with all matters before this Court, with the standard of review. Now we are concerned with that standard measured against allegations of juror misconduct.

█ In Syllabus Point 7, *State v. Johnson,* 111 W.Va. 653, 164 S.E. 31 (1932), we held:

> A motion for a new trial on the ground of the misconduct of a jury is addressed to the sound discretion of the court, which as a rule will not be disturbed on appeal where it appears that defendant was not injured by the misconduct or influence complained of. The question as to whether or not a juror has been subjected to improper influence affecting the verdict, is a fact primarily to be determined by the trial judge from the circumstances, which must be clear and convincing to require a new trial, proof of mere opportunity to influence the jury being insufficient.

█ In order to determine whether the trial judge abused his discretion, we first need to examine whether the misconduct was induced by a third-party stranger having no interest in the litigation, or whether a juror was induced to participate in an act of misconduct by an interested party. This analysis is necessary in order to determine whether prejudice is presumed, as in the latter factual construct (and unless rebutted by proof, the verdict will be set aside), or whether the misconduct was induced by a stranger or person having no interest in the litigation, thus requiring proof of manifest prejudice by clear and convincing evidence. *Legg v. Jones,* 126 W.Va. 757, 30 S.E.2d 76 (1944); *See also State v. Daniel,* 182 W.Va. 643, 391 S.E.2d 90 (1990).

We are guided by the United States Supreme Court in the recommended mechanics of how to determine whether a compromised juror reaches the level of a prejudicial occurrence demanding the reversal of the jury's verdict.

In *Remmer v. United States,* 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the Court addressed the obligation of a trial court who learns, directly or indirectly, that a juror has been contacted during a trial. In *Remmer,* a juror reported to the trial judge that he had been contacted by an unnamed individual to the extent that the juror could profit by

returning a verdict favorable to the defendant. An ex parte investigation was conducted by the Federal Bureau of Investigation, along with the United States Attorney. The conclusion that was reached as a result of the investigation—which was never shared with the defendant or his lawyer—was that the statement to the juror was considered to have been made in jest and nothing further was to be done or said about the matter. The defendant and his lawyer learned of the entire matter after the verdict and through newspaper accounts. *Id.*

Recognizing the catastrophic impact that any private communication with a juror could have in a criminal case, the Court vacated the verdict and remanded the case to the trial court to hold a hearing to "determine whether the incident complained of was harmful to the [defendant], and if after a hearing it is found to have been harmful, to grant a new trial." *Id.* at 230, 74 S.Ct. at 451–52, 98 L.Ed. at 656.

More to the point in the case *sub judice,* the Court in *Remmer* stated:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties....
>
> ... The integrity of jury proceedings must not be jeopardized by unauthorized invasions. The trial court should not decide and take final action *ex parte* on information such as was received in this case, but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.

*Id.* at 229–30, 74 S.Ct. at 451, 98 L.Ed. at 656.

A hearing (or hearings) conducted to determine whether or not any contact with a juror was prejudicial has now been informally named a *Remmer* hearing.

This Court recently had occasion to comment upon a *Remmer* hearing in *State v. Daniel,* 182 W.Va. 643, 391 S.E.2d 90 (1990). In *Daniel,* we found that a trial judge's investigation of jury tampering was sufficient to determine that no prejudice resulted to the defendant even though a *Remmer* hearing was not conducted.[6] *Daniel,* 182 W.Va. 643, 391 S.E.2d 90.

While a *Remmer* hearing was not conducted, we commented in footnote four in *Daniel* that while a *Remmer* hearing may not be mandatory, we believed it to be a better practice to hold such a hearing, with all parties present and a record made, when there are allegations of jury tampering in order to fully consider any evidence of influence or prejudice. *Daniel,* 182 W.Va. at 648, 391 S.E.2d at 95 n. 4.

In the case *sub judice,* we commend the trial court's decision to conduct a *Remmer* hearing, and in so doing we hereby expand our comment in *Daniel* by now holding that in any case where there are allegations of any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about a matter pending before the jury not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial with full knowledge of the parties; it is the duty of the trial judge upon learning of the alleged communication, contact, or tampering, to conduct a hearing as soon as is practicable, with all parties present; a record made in order to fully consider any evidence of influence or prejudice; and thereafter to make findings and conclusions as to whether such communication, contact, or tampering

---

6. In *Daniel,* the defendant's trial lawyer did not request a hearing. Failure to request a hearing and otherwise perform even the most rudimentary inquiry into the jury tampering allegation was one of the grounds raised by the defendant in a post-conviction habeas corpus petition, challenging the ineffectiveness of trial counsel. We denied the writ of habeas corpus in *State ex rel. Daniel v. Legursky,* 195 W.Va. 314, 465 S.E.2d 416 (W.Va.1995). However, the conduct of trial counsel was severely criticized in terms of the manner with which the jury tampering issue was addressed.

was prejudicial to the defendant to the extent that he has not received a fair trial.[7]

As we stated, the trial judge in this case did conduct a hearing shortly after he became aware of the contact by the juror with a State's witness. During the hearing, all parties were present in person and by counsel; a full and complete record was made; all of the witnesses who had information on the subject were permitted to testify; at the conclusion of the testimony, lawyers for the State and the defendant were given the opportunity to present the law that may help the trial court reach a conclusion based on the testimony; and finally, the trial judge did make findings and conclusions as follows:

THE COURT: I agree with both of you and that is something that the Court wishes had not happened at all and most certainly should not have happened. And Mr. Mitchell is quite right that every time the Jury leaves the Jury Room I tell them not to talk about the case even among themselves but in this case it happened. And there is no doubt about that. The question is whether or not that happening arises to such a degree that I should grant a mistrial and have a new trial.

It is my opinion after listening and I listened very carefully to the two jurors, one that went to the house and what Mr. Lowery had to say. And although there are no cases [Mr. Mitchell], to go to the three day fishing trip or even the three hour nightly visit I think there are some cases which give us guidance or gives the Court guidance on what I should do in the event that something like this occurs. I do not believe what happened here although it was terrible arises to the degree for me to grant a mistrial.

I am going to find that there was an improper contact between the Juror, Rob-

ert Jarrell, and the witness James Dickens at the home of the witness while the trial was still in progress where the case was discussed but apparently—no one has testified here and was present that the case was discussed for three hours. And apparently not even for a majority of that time and that is why I find that it was not discussed in depth.

I am further going to find that this improper contact was not procured by the State or by the Defendant, it just happened. I am also going to find that there is no evidence clear and convincing evidence that the contact actually affected the jury's deliberations and that there is no evidence that the contact actually prejudiced the defendant.

I do not think [Mr. Mitchell], that I can infer that prejudice from this three hour visit based on the testimony I have heard today. It is my conclusion that the improper contact is not sufficient to a sufficient degree to create grounds for a mistrial. So your motion on that basis is denied.

We believe that the trial court was guided by our decision in *Legg v. Jones,* 126 W.Va. 757, 30 S.E.2d 76 (1944), where the type of prejudice necessary to warrant a reversal of a jury verdict impacted by jury tampering was discussed as such:

Upon a clear and satisfactory showing of misconduct by a juror induced, or participated in, by an interested party, no proof is required that the misconduct resulted in prejudice to the complaining party. Prejudice is presumed and unless rebutted by proof the verdict will be set aside. *Flesher v. Hale,* 22 W.Va. 44 [ (1883) ]. But where such misconduct is induced by a stranger, or a person having no interest in the litiga-

7. Of course the contours of any hearing shall be shaped around the solicitudes of W.Va.R.Evid. 606(b), which provides:

*Inquiry into Validity of Verdict or Indictment.* Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental

processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

W.Va.R.Evid. 606(b) (effective July 1, 1994).

**560**

tion, unless manifestly prejudicial, the effect thereof must be established by proof. *Id.* at 763–64, 30 S.E.2d at 80.

■ Our analysis of the record leads us to the same conclusion as that of the trial court. We agree that the juror's conduct was reprehensible and in direct contravention of the trial court's instructions. We also find that the trial court did not abuse its discretion when it specifically found that the juror's misconduct did not injure the defendant, as well as when it determined that the juror's misconduct was not induced by an interested party, but instead by a stranger. In the absence of any evidence that an interested party induced the juror misconduct, no jury verdict will be reversed on the ground of juror misconduct unless the defendant proves by clear and convincing evidence that the misconduct has prejudiced the defendant to the extent that the defendant has not received a fair trial. *See* Syllabus Point 7, *State v. Johnson,* 111 W.Va. 653, 164 S.E. 31 (1932); *United States v. Klee,* 494 F.2d 394, 396 (9th Cir.), *cert. denied,* 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974).

We apply this test to the evidence that was introduced during the *Remmer* hearing conducted in the case *sub judice* and find that the defendant was not prejudiced to the extent that he did not receive a fair trial. The record is vacant of any evidence that the conversation between juror Jarrell and James and Patricia Dickens (1) manifested any indication that the juror had reached a premature decision; (2) had any influence upon the juror relating to the guilt or innocence of defendant; or (3) introduced any extrinsic evidence to the remaining jurors which influenced in any manner the jury's verdict of guilty.

We find no reversible error associated with the juror misconduct.

### III.

### ADMISSIBILITY OF HEARSAY WITHIN HEARSAY

#### A.

*Standard of Review and Rule Analysis*

■ There are two interrelated standards that apply in this case. First, an interpretation of the West Virginia Rules of Evidence presents a question of law subject to de novo review. Second, a trial court's ruling on the admissibility of testimony is reviewed for an abuse of discretion, "but to the extent the [circuit] court's ruling turns on an interpretation of a [West Virginia] Rule of Evidence our review is plenary." *Gentry v. Mangum,* 195 W.Va. 512, 518, 466 S.E.2d 171, 177, n. 4 (1995) (quoting *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 749 (3d Cir. 1994), *cert. denied sub nom. General Elec. Co. v. Ingram,* —— U.S. ——, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995) (quoting *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 944 (3d Cir.1990)). Therefore, we will not disturb the evidentiary rulings absent an abuse of discretion by the trial court.

The evidentiary issue in this case involves extrajudicial statements which are potentially hearsay. Hearsay is defined in our rules of evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.Va. R.Evid. 801(c). Hearsay is not admissible unless it falls under one of the exceptions to the hearsay rule. W.Va.R.Evid. 802. The exceptions to the hearsay rule are enumerated in Rules 803 and 804 of the West Virginia Rules of Evidence.

■ The defendant contends that Mr. Lusk's testimony regarding what he was told by the victim is inadmissible as hearsay within hearsay, in that the victim told her father what the defendant told her. Hearsay within hearsay, also known as double hearsay, is a statement made by a declarant that repeats or addresses a statement made by another declarant. *See generally* 2 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 8–5 (3d ed. 1994). Our rules of evidence provide guidance as to how to treat potential hearsay within hearsay. W.Va.R.Evid. 805 states, "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rules." Therefore, under Rule 805,

we examine each level of an extrajudicial statement to determine if it is admissible under an exception to the hearsay rule. If each level satisfies any of the hearsay exceptions, the evidence is admissible.

## B.

### *Admissibility of Defendant's Threat to the Victim*

We first examine the statement made by the defendant to the victim. Mr. Lusk testified he was told by the victim that the defendant threatened to kill her if she ever tried to leave him again. The State maintains that the defendant's threat is an admission by a party-opponent; therefore admissible as non-hearsay under W.Va. R.Evid. 801(d)(2). This Court has not previously analyzed whether a threat to do an act in the future is non-hearsay under Rule 801(d)(2).

While a threat to do something in the future would at first not seem to qualify as an admission of past wrongdoing, as Rule 801(d)(2) is commonly applied, there is no requirement that a statement must relate back to an event for it to qualify. Rule 801(d)(2) provides, "[a] statement is not hearsay if ... [it] is offered against a party and is [ ] the party's own statement." Other jurisdictions that have addressed this question have held that threats, prospective statements of wrongdoing, do comply with the requirements of Rule 801(d)(2) and therefore fall within its scope. *See, e.g., United States v. Guerrero*, 803 F.2d 783 (3d Cir.1986) (evidence of a threatening statement did not constitute hearsay because it was a statement of a party, offered against that party, and therefore not subject to the hearsay rule); *State v. Hernandez*, 120 Idaho 653, 818 P.2d 768 (Idaho Ct.App.1991) (testimony of witness in regard to threatening letters she received from the defendant, which she could not produce at trial, was admissible under Idaho R.Evid. 801(d)(2) on the rationale that admissions "[do] not merely refer to inculpatory statements by a party that he committed the act in question," but include words or conduct of a party which are offered against him); *State v. Collins*, 335 N.C. 729, 440 S.E.2d 559 (1994) (defendant's testimony regarding his own out-of-court threats against the murder victim was admissible as an admission by a party-opponent).

We believe there is sufficient support for a broader application of Rule 801(d)(2) so as to include a threat as an admission. Scholars who have commented upon the rationale of including threats under Rule 801(d)(2) reason that:

> [c]onfessions of crime are a particular kind of admission.... Admissions do not need to have the dramatic effect or be the all-encompassing acknowledgement of responsibility that the word confession connotes. They are simply words or actions inconsistent with the party's position at trial, relevant to the substantive issues in the case, and offered against the party.

2 *McCormick on Evidence* § 254, at 142 (John W. Strong ed., 4th ed. 1992) (footnote omitted). We hold that a threat to commit an act in the future, if made by the declarant/party and offered against the party, is not hearsay under W.Va.R.Evid. 801(d)(2).

The threat to kill the victim if she ever left him again was made by the defendant and was offered against him at trial. Therefore, the defendant's threat satisfies the requirements of Rule 801(d)(2) and is admissible as a statement which is not hearsay. This part of the hearsay within hearsay as expressed with a Rule 805 formula is therefore satisfied.

As a redundant position, the State contends that if the threat does not qualify as non-hearsay under Rule 801(d)(2), it is still admissible hearsay under the exception contained in W.Va.R.Evid. 803(3), which is better known as the state of mind exception. For some reason, neither party centers its position testing the admissibility of the threat under a "state of mind" exception upon a Rule 803(3) analysis. Instead, the parties argue whether the statement by the defendant satisfies the requirements of *State v. Duell*, 175 W.Va. 233, 332 S.E.2d 246 (1985). In *Duell*, we held that a threat made against a victim two weeks before the homicide was admissible, if nothing else to show premeditation. *Id.*

■ *Duell* was decided approximately four months after the codification of the West Virginia Rules of Evidence and did not rely on Rule 803(3) in reaching its conclusion. Accordingly, we find that *Duell* is not dispositive of any evidentiary issue that is embraced within the West Virginia Rules of Evidence. However, since its holding is not contrary to Rule 803(3), we find that *Duell* remains as a "source of guidance." [8] *Reed v. Wimmer,* 195 W.Va. 199, 205, 465 S.E.2d 199, 205 (1995).

Rule 803(3) provides that the following are not excluded by the hearsay rule, even though the declarant is available as a witness:

> (3) *Then Existing Mental, Emotional, or Physical Condition.*—A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

W.Va.R.Evid. 803(3).

■ We do not believe it necessary to find another justification to hold that the defendant's statement to the victim is admissible since it is not hearsay under Rule 801(d)(2). However, if the statement needs another reason to endorse its admissibility, we believe the threat is a manifestation of the defendant's state of mind as it relates to the issue of premeditation and is therefore an exception to the hearsay rule under W.Va. R.Evid. 803(3). Despite the lapse of three months between the threat and its fulfillment, the record convinces us that the day of the shooting was the first time since the threat was made that the victim attempted to commit the underlying act which would trigger the threat—leaving the defendant.

Accordingly, the threat made by the defendant to the victim, to the extent that he would kill the victim if she left him again, is admissible either as non-hearsay as an admission by a party pursuant to Rule 801(d)(2), or alternatively as hearsay admissible under the state of mind exception under Rule 803(3).

## C.

### *Admissibility of Victim's Recitation to Father of Defendant's Threat*

■ Under our Rule 805 analysis, we must now examine whether the recitation of the defendant's threat by the victim to her father was admissible.

The State finds justification in the repetition of the threat from the victim to her father under the "excited utterance exception" within W.Va.R.Evid. 803(2), which provides:

> The following [is] not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> (2) *Excited Utterance.*—A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

Mr. Lusk testified that he went to his mother's house to pick up his daughter, and while leaving, they were confronted by the defendant approximately one block from the house. Mr. Lusk stated that his daughter and the defendant went into the defendant's automobile where they engaged in a conversation lasting approximately thirty minutes. Mr. Lusk testified that while he could not hear the contents of the conversation, he observed the defendant leaning toward his daughter, when she started to cry. After the conversation ended, Mr. Lusk escorted his daughter to his mother's house so that she could collect her belongings. After walking about one-half block from the defendant's automobile, and while still "scared," "nervous," and "shaking," the victim told her

8. We take this opportunity once again to remind that " '[t]he West Virginia Rules of Evidence remain the paramount authority in determining the admissibility of evidence in circuit courts. These rules constitute more than a mere refinement of common law evidentiary rules, they are a comprehensive reformulation of them.' Syllabus Point 7, *State v. Derr,* 192 W.Va. 165, 451 S.E.2d. 731 (1994)." Syllabus Point 1, *Reed v. Wimmer,* 195 W.Va. 199, 465 S.E.2d 199 (1995).

father that the defendant had threatened to kill her if she left him.

We find the justification for the reliability of an excited utterance in *State v. Jones*, 178 W.Va. 519, 362 S.E.2d 330 (1987), where we stated that "[t]he excited utterance exception is predicated on the theory that a person stimulated by the excitement of an event and acting under the influence of that event will lack the reflective capacity essential for fabrication." *Id.* at 522, 362 S.E.2d at 333. The rationale upon which this theory rests is that "a guarantee of reliability surrounds statements made by one who participates in or observes a startling event, provided they are made while under the stress of excitement." *State v. Smith*, 178 W.Va. 104, 109, 358 S.E.2d 188, 193 (1987).

In *Smith*, we noted the evolution in West Virginia of the excited utterance from its common law ancestor, the spontaneous declaration: "Rule 803(2) of the West Virginia Rules of Evidence correctly contains the heart of the hearsay exception that was formerly called a spontaneous declaration and which is now termed the excited utterance exception to the hearsay rule." Syllabus Point 1, in part, *State v. Smith*, 178 W.Va. 104, 358 S.E.2d 188 (1987). In determining the admissibility of a statement under the common law spontaneous declaration exception to the hearsay rule, we provided a comprehensive list of factors:

An alleged spontaneous declaration must be evaluated in light of the following factors: (1) The statement or declaration made must relate to the main event and must explain, elucidate, or in some way characterize that event; (2) it must be a natural declaration or statement growing out of the event, and not a mere narrative of a past, completed affair; (3) it must be a statement of fact and not the mere expression of an opinion; (4) it must be a spontaneous or instinctive utterance of thought, dominated or evoked by the transaction or occurrence itself, and not the product of premeditation, reflection, or design; (5) while the declaration or statement need not be coincident or contemporaneous with the occurrence of the event, it must be made at such time and under such circumstances as will exclude the presumption that it is the result of deliberation; and (6) it must appear that the declaration or statement was made by one who either participated in the transaction or witnessed the act or fact concerning which the declaration or statement was made.

Syllabus Point 2, *State v. Young*, 166 W.Va. 309, 273 S.E.2d 592 (1980), *modified on other grounds by State v. Julius*, 185 W.Va. 422, 408 S.E.2d 1 (1991). These factors have survived the codification of the Rules of Evidence as reflected in Syllabus Point 2, *State v. Murray*, 180 W.Va. 41, 375 S.E.2d 405 (1988).

While we still find the six-factor test recited in *Young* to be instructive, we also find ourselves looking for more efficient protocols in performing the necessary analysis of Rule 803(2). The West Virginia Rules of Evidence are patterned upon the Federal Rules of Evidence, *State v. Smith*, 178 W.Va. at 109, 358 S.E.2d at 193, and we have repeatedly recognized that when codified procedural rules or rules of evidence of West Virginia are patterned after the corresponding federal rules, federal decisions interpreting those rules are persuasive guides in the interpretation of our rules. *See, e.g., Painter v. Peavy*, 192 W.Va. 189, 192, 451 S.E.2d 755, 758 n. 6 (1994) ("Because the West Virginia Rules of Civil Procedure are practically identical to the Federal Rules, we give substantial weight to federal cases . . . in determining the meaning and scope of our rules."); *State v. McGinnis*, 193 W.Va. 147, 158, 455 S.E.2d 516, 527 n. 14 (1994) (applying *Painter v. Peavy* in the context of the West Virginia and Federal Rules of Evidence). The federal cases, while not departing from the theme expressed in the six-factor test of *Young*, have distilled those factors into a three-part analysis where, in order to qualify as an excited utterance under Rule 803(2): (1) the declarant must have experienced a startling event or condition; (2) the declarant must have reacted while under the stress or excitement of that event and not from reflection and fabrication; and (3) the statement must relate to the startling event or condition. *See Morgan v. Foretich*, 846 F.2d 941, 947 (4th Cir.1988); *United States v. Moore*, 791 F.2d 566, 570 (7th Cir.1986); *David v.*

*Pueblo Supermarket,* 740 F.2d 230, 235 (3d Cir.1984).

We are not rejecting the six-factor test recited in *Young;* however, we believe that the three-part analysis synthesizes these six factors and provides for a more efficient analysis of Rule 803(2).[9]

### 1.
### *Did victim experience a startling event or condition?*

▇▇▇ Defendant argues that the statement did not emerge from an event that was at the level necessary to evoke excitement. Often, the predicate event in excited utterance cases involves physical injuries. *See, e.g., State v. Jones,* 178 W.Va. 519, 362 S.E.2d 330 (1987) (child molestation); *State v. Young,* 166 W.Va. 309, 273 S.E.2d 592 (1980) (gun shot wound, ultimately fatal), *modified on other grounds by State v. Julius,* 185 W.Va. 422, 408 S.E.2d 1 (1991); *State v. Mahramus,* 157 W.Va. 175, 200 S.E.2d 357 (1973) (rape); *United States v. Scarpa,* 913 F.2d 993 (2d Cir.1990) (severe physical beating).

However, an excited utterance can be provoked by non-physical events as well. *See, e.g., United States v. Martin,* 59 F.3d 767 (8th Cir.1995) (declarant's statements, precipitated by defendant's threat to burn house down and observation of defendant with a gas can preparing Molotov cocktails, came within excited utterance exception); *United States v. Bailey,* 834 F.2d 218 (1st Cir.1987) (declarant juror's statements regarding a neighbor's attempted bribe, a sufficiently startling event, were admissible as excited utterances); *United States v. Moore,* 791 F.2d 566 (7th Cir.1986) (declarant's statement that, "I've found the evidence I've been waiting for for a long time," which was made upon finding of phony bid sheets in the defendant's wastebasket, was admissible as excited utterance). We believe that this is such a case. While there is no indication that the victim was physically harmed by the events that occurred in the defendant's automobile, she was clearly distraught as a result of the conversation with the defendant. Mr. Lusk testified that he observed the victim crying during the conversation with the defendant, and that she was "scared," "nervous," and

"shaking," when she repeated the statement to him.

We have also found in the past that independent proof of the existence of the exciting event may be found in the statement itself. We recognized in *State v. Smith,* 178 W.Va. 104, 358 S.E.2d 188 (1987), that "the statement itself may carry sufficient indicia of the exciting event." *Id.* at 110–111, 358 S.E.2d at 195 (citing *Collins v. Equitable Life Ins. Co.,* 122 W.Va. 171, 8 S.E.2d 825 (1940)). In *Smith,* we held that the declarant's agitated voice and her statements in regard to the excited event—a fight between her husband and the defendant—were sufficient proof of the existence of the exciting event. *Smith,* 178 W.Va. 104, 358 S.E.2d 188.

We conclude that the conversation between the defendant and the victim in the defendant's automobile, wherein he informed the victim that he would kill her if she left him, was a "startling event or condition."

### 2.
### *Was the statement repeated by victim to her father while she was under the stress or excitement of the event and not from reflection and fabrication?*

The defendant urges that the victim's statement was not sufficiently contemporaneous with the conversation and, therefore, was more a product of reflection and fabrication rather than the stress or excitement of the event. The question, then, is whether the time lapse between the startling event and the statement from the victim to the father while walking down the street provided the victim with enough time to reflect, thereby lacking the spontaneity required under Rule 803(2). Again, we look to the federal cases that have spoken to this issue, specifically *United States v. Iron Shell,* 633 F.2d 77 (8th Cir.1980) *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). In *Iron Shell,* the court held that a nine-year-old victim's statements made forty-five to sixty minutes after the alleged sexual assault were admissible as excited utterances. Specifically, the *Iron Shell* court noted that a lapse of

---

**9.** In adopting this three-part analysis, we are fulfilling Justice Miller's prophecy in *State v. Smith,* 178 W.Va. 104, 358 S.E.2d 188 (1987), to the extent that he acknowledged that "[t]here is a certain amount of redundancy in our summary of the [excited utterance], as ... contained in ... [*State v. Young* ]." *Id.* at 110, 358 S.E.2d at 194.

approximately one hour did not remove the statement from the Rule 803(2) exception. *Id.*

■ *Iron Shell* developed a formula to assist in answering whether the statement was made while under the stress or excitement of the event and not from reflection and fabrication. Several factors must be considered, including: (1) the lapse of time between the event and the declaration; (2) the age of the declarant; (3) the physical and mental state of the declarant; (4) the characteristics of the event; and (5) the subject matter of the statements. *Iron Shell*, 633 F.2d at 85–86.

Here, as we interpret the record, the victim related the defendant's threat to her father within a relatively short period of time after her conversation with the defendant.[10] In *Morgan v. Foretich*, 846 F.2d 941 (4th Cir.1988), the Fourth Circuit held that a statement made three hours after the predicate event was well within the bounds of reasonableness and not made as a result of deliberation. While we do not deny that spontaneity can evaporate within a matter of seconds, we do find persuasive Mr. Lusk's unrefuted testimony that the victim was in such an agitated state that she did not have time to reflect, and therefore fabricate the statement as the defendant would suggest. Her demeanor did not change from the time that he observed her in the automobile to the time that the statement was made, and she appeared "scared," "nervous," and "shaking," as a result of her conversation with the defendant. Accordingly, when we apply the factors in *Iron Shell*, we have no hesitancy in concluding that the statement made by the defendant to the victim that he would kill her if she left him, which was later repeated to her father, was made at a time when the victim was under the stress of the event and not from reflection and fabrication.

### 3.
### *Did the statement relate to the startling event?*

Mr. Lusk's testimony leaves no doubt that his daughter's account of the threat upon her life was related to the startling event consisting of the thirty-minute confrontation inside the defendant's automobile. We have no hesitancy in concluding that the statement related to the startling event.

■ The defendant also attempts to avoid the excited utterance exception by arguing that Mr. Lusk could not actually hear the contents of the conversation between the defendant and the victim. We find no merit in this contention. We have previously held that "[a] witness who testifies about an excited utterance of a third person need not be present at the exciting event as a condition for its admissibility." Syllabus Point 2, *State v. Smith*, 178 W.Va. 104, 358 S.E.2d 188 (1987). The rationale is that "[t]he veracity of the declaration is not founded upon the witness's participation in the event, but upon the participation of the declarant." *Id.* at 110, 358 S.E.2d at 194. The fact that Mr. Lusk could not hear the conversation is irrelevant.

Applying our three-part test, we conclude that the victim's extrajudicial statement to her father was made after she experienced a startling event of having her life threatened, was repeated without sufficient time to reflect and thereafter to fabricate the threat, and was related to the startling event. The victim's statement to her father, Mr. Lusk, is admissible as hearsay within the excited utterance exception.

We therefore find that each level of the extrajudicial statement is admissible: the defendant's threat is admissible as non-hearsay—an admission by a party-opponent—under Rule 801(d)(2), or alternatively as hearsay admissible under the Rule 803(3) state-of-mind exception; and the victim's recitation to her father is hearsay admissible as an excited utterance under Rule 803(2).[11]

---

10. There was no testimony quantifying the length of time between the end of the conversation in the defendant's automobile and the repetition of the threat. During testimony offered as part of the defendant's motion in limine to prevent the admission of this threat, Mr. Lusk stated that he

and his daughter walked one-half block before she repeated the threat to him.

11. We recognize the propriety in performing a threshold Rule 805 analysis in order to determine whether the extrajudicial statement offered

## IV.

### CONCLUSION

In summary, we find that the defendant has not proven by clear and convincing evidence that the juror misconduct has prejudiced him to the extent that he did not receive a fair trial. Further, we find no abuse of discretion by the trial court in permitting the State to introduce evidence of a statement made to the victim by the defendant, repeated by the victim to her father, and offered through the victim's father. The defendant's conviction is affirmed.

Affirmed.

CLECKLEY, J., deeming himself disqualified, did not participate in this case.

through the victim's father is admissible upon a hearsay within hearsay challenge. However, because the defendant's threat was admissible as non-hearsay, there is actually no hearsay within hearsay problem under Rule 805. *See* 2 Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 8–5, at 294 (3d ed. 1994).